

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-3-2006

# Chavarria v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-1223

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Chavarria v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1012.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1012

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-1223
_____

CELSO CHAVARRIA,

Petitioner

v.

ALBERTO GONZALEZ,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

_____

Petition for Review of an Order of the
Board of Immigration Appeals
(No. A70-799-216 )

_____

Argued June 30, 2005

Before: NYGAARD[*], SMITH, and FISHER, <u>Circuit</u> <u>Judges</u>.


(Filed: May 3, 2006)

Thomas E. Moseley, Esq. (ARGUED)
One Gateway Center, Suite 2600
Newark, NJ 07102
     <u>Counsel for Petitioner</u>

Arthur L. Rabin, Esq. (ARGUED)
Linda S. Wernery, Esq.
Lyle D. Jentzer, Esq.
Julia K. Wilcox, Esq.
William C. Peachey, Esq.
United States Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DC 20044
     <u>Counsel for Respondent</u>


_____

OPINION OF THE COURT
_____

_____

[*] Judge Richard L. Nygaard assumed senior status on July 9, 2005.

2

NYGAARD, <u>Circuit</u> <u>Judge</u>.

Petitioner Celso Chavarria, a native of Guatemala, petitions this court for review of the Board of Immigration and Appeal's ("BIA") denial of his application for asylum and withholding of removal. We find that the BIA applied the correct standard of review under 8 C.F.R. § 1003.1(d)(3)(i). However, because the BIA mischaracterized the nature and degree of the threats Chavarria faced and understated the effect these threats had, its factual findings are not supported by substantial evidence. In addition, the BIA's conclusion that Chavarria is not entitled to asylum or withholding of removal because he failed to establish a well-founded fear of persecution is not substantially supported by the record. We therefore will reverse the BIA's decision and grant the petition for review.

**I. Facts and Procedural History**

3

During the second half of the 20th Century, Guatemala experienced a variety of military and civilian governments as well as a thirty-six year guerilla insurgency. This insurgency caused more than 200,000 deaths and disappearances, the majority of which were civilians.[1] However, the Government signed an agreement in 1996 at which point the insurgency formally ended. Chavarria's claim for asylum stems from two incidents that occurred in 1992, during the apogee of the insurgency. As we discuss in detail later, the BIA's explanation of these factual incidents differed in material ways from Chavarria's testimony, despite the fact that the BIA and the Immigration Judge ("IJ") accepted Chavarria's testimony as credible. Because Chavarria's testimony has been accepted as

---

[1.] For more generally regarding the conditions of Guatemala, see the database *available at* http://www.womenwarpeace.org/guatemala/guatemala.htm#docs.

credible, we will relay the facts as Chavarria testified to them. *Li v. Attorney General of the U.S.*, 400 F.3d 157, 164 (3d Cir.2005).

At all relevant times, Chavarria was essentially apolitical. He belonged to no political movements, nor did he ascribe particular allegiance to the ruling government. He was also never a member of any anti-government grassroots, political or social groups. The first and primary incident relating to Chavarria's asylum claim occurred while Chavarria was driving through Guatemala City. From his car, he saw two young women being attacked by what he believed were paramilitary forces.[2] After parking his car, he began walking toward the altercation but when he saw that the men were pulling the women's clothing off he returned to his car and retrieved some

---

[2] The IJ found that these "paramilitary types" were "government people."

5

towels. When he returned, the men had withdrawn and he helped the women cover themselves with the towels. Then, at the women's request, he escorted them to safety. When he returned home he told his wife about the incident.

A few days later, Chavarria's wife informed him that there was a car circling their house. Chavarria saw the car and its occupants and recognized them as the same paramilitaries who had assaulted the women.[3] Additionally, an article about the incident appeared in the paper. From the article, Chavarria learned that the women were members of a well known human

---

[3] Specifically, Chavarria testified that, "[a]nd then after four or five days, my wife told me that there was car [sic] going around my house, and to my surprise, this car was the same car that I had seen before in that place [referring to the attack]." Then, in response to the question, "[i]n other words, with the two women, the incident, that was the same car?" Chavarria replied, "Yes, exactly." Later in his testimony, Chavarria again testified that he "saw the vehicle next to my house, and these people looked familiar to me, and this is when I started to feel fear because I remembered about the incident that I helped these two women that time."

rights organization, the National Coordination of Widows of Guatemala ("CONAVIGUA"), which opposes the government.[4] In the article, the women confirmed that they had been beaten, threatened, and stripped. They also stated that a person had come to their aid and covered them. Chavarria's name did not appear in the article. Chavarria testified that after seeing the paramilitary's car parked next to his home and the article in the paper, he was afraid that the paramilitary members would retaliate against him for the assistance he had rendered to the women.

---

[4.]More specifically, CONAVIGUA is a women's organization established to discover the fate of those "disappeared" during the Guatemalan civil war. In addition, the group advocates on a host of issues, including conscientious objection, and supports people displaced due to the conflict. The organization gained notoriety when one of their members, Rigoberta Menchu, won the Nobel Peace Price in 1992. The organization is apparently also known as the Commission of Widows.

Consequently, Chavarria came to the United States and began an asylum application. He returned to Guatemala, however, when he was unable to get a job and because he was concerned about his ability to support himself and his family. While living again in Guatemala, a second incident occurred. Driving one night, Chavarria's car was cut off by another vehicle. Armed men got out of the vehicle and forced him into the back of his car. They placed a gun to his head and another to his stomach and robbed him. They also threw his keys out into a field and instructed him not to move for five minutes. Before leaving, the men told Chavarria that "if we ever see you again, you're not going to even live to tell the story." Chavarria believed these men attacked him because of his previous aid to the two humanitarian workers and again fled to the United States and pursued his asylum application. Because Chavarria's

8

timely appeal implicates both legal and factual issues, we will briefly recount both the IJ and the BIA opinions.

## A. The Immigration Judge

The IJ assumed Chavarria to be credible and therefore accepted the description of the two incidents as we have related them above. Although the IJ found that some of Chavarria's actions were "curious," overall, the IJ determined that Chavarria was telling the truth. Despite this determination, the IJ denied Chavarria's application for asylum because "[Chavarria's] connection with [CONAVIGUA] is so tenuous, so casual, so cursory, that the government was not after him because of his political opinion, but because of some way he in a minor way assisted them." The IJ went on to explain that "casual assistance, as altruistic and admirable as it may have been" did not qualify him for political asylum.

9

The IJ's determination rested on an analysis of Chavarria's claims for asylum on account of an expressed political opinion rather than an imputed political opinion, stating in part that:

> I do not believe the mere act of assistance in a charitable way of a good Samaritan to get somebody off the streets and to clothe them is espousing a political opinion on his part which the government would want to suppress. . . . To consider him, the mere good Samaritan whose casual short, few minute episode assisting these people, would be to expand the concept of political opinion beyond any reasonable bounds.

The IJ also failed to discuss the implications of the attack in Chavarria's car after he returned from his trip to the United States other than to say that the attack "had nothing to do with his political opinion" or any other protected grounds.

Thus, the IJ denied Chavarria's application for asylum and withholding of removal on legal grounds by holding that humanitarian assistance was not sufficient to establish

10

persecution on the grounds of expressed political opinion. The IJ did not make any findings with respect to whether Chavarria had suffered past persecution or had a well-founded fear of future persecution.

## B. The BIA

The BIA heard Chavarria's appeal from the IJ's decision twice. In its first order, the BIA agreed with the factual findings of the IJ but concluded that the "surveillance following his intervention on the behalf of the human rights members in 1992 was likely on account of an imputed political opinion." However, the BIA went on to find that the surveillance, even if accepted as true, did not rise to the level of past persecution and therefore could not satisfy the burden of establishing grounds for asylum. In addition, it concluded that "the 1993 robbery incident was not politically motivated as no political statements were made." Concluding that Chavarria could not demonstrate

11

the reasonable likelihood of future persecution, the BIA affirmed the IJ's decision.

We granted Chavarria's petition for review after the first adverse ruling from the BIA because it stated that Chavarria failed to show a clear probability that his life or freedom would be threatened "if returned to Haiti." Chavarria is a citizen of Guatemala; therefore, pursuant to a stipulation of the parties, we remanded the matter to the BIA to reconsider Chavarria's appeal due to the factual, albeit unintentional, error in its opinion.

When the BIA took up Chavarria's appeal for a second time, it stated that "the substantive reasons for our decision upholding the Immigration Judge's denial of asylum still stand." After reiterating its view that Chavarria had presented credible testimony, the BIA recounted the two incidents forming the basis of Chavarria's asylum application.

After describing the 1992 incident in which Chavarria aided the two female CONAVIGUA members, the BIA stated, "[Chavarria] did not directly confront the attackers, nor did his name become known to any of the people involved." They found that Chavarria only "thought [the car next to his house] might have people in it who were involved in the assault." The BIA went on to discuss the "robbery" that took place in Chavarria's car, stating that Chavarria was "threatened with death if he told what happened."

On these findings, the BIA determined that Chavarria could establish an imputed political opinion. However, they denied him asylum, concluding that he failed to demonstrate past persecution, because there was never any specific threat of harm rising to the level of past persecution or any physical harm related to the imputed opinion. In addition, they summarily rejected his claim of future persecution.

13

## II. Jurisdiction and Standard of Review

The BIA has appellate jurisdiction over decisions of an IJ in removal cases initiated by the INS under 8 C.F.R. § 1003.1(b) (2004).[5] Our jurisdiction arises under 8 U.S.C. § 1252(a), which provides the exclusive procedural mechanism for judicial review of all final removal orders. The BIA's final order was entered on December 30, 2003, and the petition for review was timely filed on January 27, 2004, within the required 30 days. *See* 8 U.S.C. § 1252(b).

Where, as here, the BIA issues a decision on the merits and not simply a summary affirmance, we review the BIA's, and not the IJ's, decision. *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002). When there are special circumstances, however, we also look to the decision of the IJ. *Id; See also Voci v. Gonzales*,

_____

[5.]During the pendency of this case, the INS, the agency initially in charge of immigration matters, was replaced by the Bureau of Immigration and Customs Enforcement.

14

409 F.3d 607, 612 (3d Cir. 2005) (clarifying that we should look to the IJ's decision where the BIA expressly adopts a portion of that opinion or defers to it). In reviewing decisions of the BIA, this Court applies a deferential standard of review. The BIA's conclusions regarding evidence of past persecution and the well-founded fear of persecution are findings of fact, and we therefore review these conclusions under the deferential substantial evidence standard. *Abdille v. Ashcroft*, 242 F.3d 477, 483-83 (3d Cir. 2001). So long as the BIA's decision is supported by "reasonable, substantial, and probative evidence on the record considered as a whole," we will not disturb the BIA's disposition of the case. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). A BIA decision can only be reversed if the evidence is such that a reasonable factfinder would be compelled to conclude otherwise. *See id.* Nonetheless, the BIA must substantiate its decisions. We will not accord the BIA

15

deference where its "findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003).

### III. Discussion

To obtain a grant of asylum, an alien must demonstrate that he is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42). To succeed, an alien must show that he is a person who is unwilling or unable to return to his home country because of "[past] persecution or well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Thus, an alien may demonstrate either that he qualifies for asylum because of past persecution or because he fears future persecution if returned to his native country. However, the persecution, either past or future, must be motivated by one of the statutorily protected grounds. 8

16

U.S.C. § 1101(a)(42)(A). Included within these grounds, and relevant to this case, is persecution on account of imputed political opinion. We will grant asylum to an otherwise qualified alien where the motives and perspective of the persecutor demonstrate that the persecution was on account of a belief attributed to the alien, even where the alien did not overtly subscribe to that belief. *See Desir v. Ilchert*, 840 F.2d 723, 728 (9th Cir. 1988). Testimony of an alien, where credible, may be sufficient to support a claim for asylum under either category. *Gao*, 299 F.3d at 271.

## A. *De novo* review and first instance factfinding

As an initial matter, Chavarria argues that the BIA engaged in improper fact-finding under 8 C.F.R. § 1003.1(d)(3), a regulation governing BIA standards of review.[6] We disagree.

---

[6] 8 C.F.R. § 1003.1(d), in relevant part states:
(3) Scope of Review

(continued...)

This regulation, enacted in 2002, changed the standard of review

the BIA exercises over an IJ's findings of fact from *de novo*

review to clearly erroneous review.  8 C.F.R. § 1003.1(d)(3)(i).

---

[6.](...continued)

> (i) The Board will not engage in de novo review of findings of fact determined by an immigration judge.  Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

8 C.F.R. § 1003.3(f)[7] states that "[a]ll cases and motions pending on September 25, 2002, shall be adjudicated according to the rules in effect on or after that date, except that § 1003.1(d)(3)(i) shall not apply to appeals filed before September 25, 2002." Thus, any case in which an appeal was filed prior to September 25, 2002 is not subject to the new standard of review set forth in 8 C.F.R. 1003.1(d)(3)(i). Accordingly, for these cases the BIA must engage in *de novo* review of all factual

---

[7.]In its entirety, 8 C.F.R. 1003.3(f) states:

(f) Application on effective date. All cases and motions pending on September 25, 2002, shall be adjudicated according to the rules in effect on or after that date, except that § 1003.1(d)(3)(i) shall not apply to appeals filed before September 25, 2002. A party to an appeal or motion pending on August 26, 2002, may, until September 25, 2002, or the expiration of any briefing schedule set by the Board, whichever is later, submit a brief or statement limited to explaining why the appeal or motion does or does not meet the criteria for three-member review under § 1003.1(e)(6).

findings of the IJ and is free to accept or disregard the IJ's factual findings in any given matter. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 n(3d Cir. 2001). Since Chavarria instituted his appeal prior to September 25, 2002, the newly-enacted regulation § 1003.1(d)(3)(i) does not apply to his case. Instead, the BIA was correct when it engaged in de novo review of the IJ's factual findings. *De novo* review allows the BIA to engage in factfinding in the first instance when the BIA rejects, in whole or in part, the IJ's factual determination. *Id.*; *see also Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004) (concluding that the former *de novo* standard of review applied, not § 1003.1(d)(3)(i)'s clear error standard, and noting that it was reviewing the "BIA's decision and its *de novo* factfinding rather than the IJ's decision and its factfinding"); *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998) (observing that BIA's de novo review allows it to "independently assess [the IJ's]

20

determination and make de novo findings"); *Ramirez-Alejandre*

*v. Ashcroft*, 320 F.3d 858, 864 (9th Cir. 2003) (listing cases

reflecting BIA's earlier power to engage in fact finding while

conducting its de novo review).  Accordingly, the BIA's fact

finding  was not impermissible.

Chavarria also contends that the BIA failed to adhere to

a second provision, 8 C.F.R. 1003.1(d)(3)(iv), which addresses

BIA factfinding, thereby violating the regulations.[8]  He argues

that this provision bars the BIA from engaging in fact finding in

the first instance.   While we agree that § 1003.3(f) makes this

---

[8.]In relevant part, the provision states:

> (iv) Except for taking administrative notice of commonly
> known facts such as current events or the contents of
> official documents, the Board will not engage in
> factfinding in the course of deciding appeals.  A party
> asserting that the Board cannot properly resolve an
> appeal without further factfinding must file a motion for
> remand.  If further factfinding is needed in a particular
> case, the Board may remand the proceeding to the
> immigration judge, or, as appropriate, to the Service.

21

subsection applicable to appeals like Chavarria's which were pending before September 25, 2002, we need not determine whether this provision barred the BIA from making factual determinations in this appeal. Instead, cognizant that there is some overlap between the applicable *de novo* review standard and the statutory language of § 1003.1(d)(3)(iv), which we presume precludes factfinding in the first instance, we apply the "well-settled maxim that specific statutory provisions prevail over more general provisions . . . ." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 237 n.49 (3d Cir. 2004). Thus, § 1003.3(f)'s general statement that the new rules are applicable to all pending appeals must yield to the specific exception for the application of § 1003.1(d)(3)(i), thereby requiring the BIA to engage in *de novo* review for appeals pending as of September 25, 2002.

## B. Past Persecution

22

Chavarria next claims that the BIA erred when it determined that his claims did not satisfy the burden of proving past persecution on account of an imputed political opinion. As we noted earlier, the requirement that the BIA's decision be supported by substantial evidence is not an empty one. Thus, if no reasonable fact finder could reach the same conclusion as the BIA based on the record then the finding is not supported by substantial evidence. *See Elias Zacarias*, 502 U.S. at 481. In determining whether the BIA erred, this court is required to look at the record as a whole. *Dia*, 353 F.3d at 249-50. Here, in looking at the record, we conclude that the BIA mischaracterized and understated the nature of the evidence supporting Chavarria's claims such that their conclusions are not supported by substantial evidence. We note with importance that the BIA accepted Chavarria's testimony as credible and again caution the Board in the future to be diligent in accurately

23

representing the evidence and testimony put forth by the alien where that evidence is credible. *See Li v. Atty Gen'l of the U.S.*, 400 F.3d 157, 159 (3d Cir. 2005). By mischaracterizing and understating the evidence in the record, the BIA succeeded in reaching a conclusion not supported by substantial evidence such that we are compelled to reach a conclusion to the contrary.

To establish past persecution, an alien must first show that he suffered persecution. *Lukwago v. Ashcroft*, 329 F.3d 157, 167-68 (3d Cir. 2003). It is well settled that persecution does not encompass all forms of unfair, unjust, or even unlawful treatment. *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993). Instead, we have defined persecution to include "threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom." *Lukwago* 329 F.3d at 168 (quoting *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001). In addition, these threats must be on account of a

24

statutorily protected ground, which includes imputed political opinion, and may be established through credible and persuasive testimony of the applicant. *See Desir*, 840 F.2d at 727-28. However, we have limited the type of threats constituting persecution to "only a small category of cases, and only when the threats are so menacing as to cause significant actual 'suffering or harm.'" *Li*, 400 F.3d at 164 (quoting *Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000). We have further defined acceptable threats to include only those that are highly imminent and menacing in nature. *Id.* Thus, we have refused to extend asylum protection for threats that, while sinister and credible in nature, were not highly imminent or concrete or failed to result in any physical violence or harm to the alien. For example, in *Li* we credited Li's descriptions of being threatened with sterilization and physical violence. However, we refused to define these threats as persecution for the purposes of Li's claim

because they were not sufficiently imminent or concrete. *See id*. at 163-64.

We first address whether Chavarria established that he was persecuted on account of a statutorily protected ground. Assuming Chavarria's testimony to be credible, the BIA, in its first crack at the record, found that the surveillance of Chavarria was on account of an imputed political opinion. This finding finds substantial support in the record based on Chavarria's testimony that he recognized both the car and the occupants as the paramilitaries present during the attack on the CONAVIGUA women. The clear import of this testimony is that the paramilitaries associated Chavarria with the women members of CONAVIGUA and imputed their political opinion to him. However, on remand, the BIA changed its position with respect to whether the paramilitaries were actually surveilling Chavarria, stating "the respondent saw a car next to his house

26

which he thought *might* have people in it who were involved in the assault." (emphasis added). The BIA also determined that "[Chavarria's] name [did not] become known to any of the people involved in the incident" and also that his involvement in the incident was anonymous. Of these three factual determinations, the first substantially mischaracterizes Chavarria's testimony and the second two find no support from the record.

Chavarria testified that after the incident his wife noticed a car circling their home. When asked to describe this event, Chavarria stated:

> I saw the vehicle next to my house, and these people looked familiar to me, and this is when I started to feel fear because I remembered about the incident that I helped these two women that time. And by, and by this time, I saw in the paper, in the newspaper, that these women had denounced this, by means of their organization, that they belonged to, they denounced these people and the car.

27

A diligent reading of this testimony makes it obvious that Chavarria was being surveilled by the same people involved in the initial attack. The BIA's finding that Chavarria only thought that these were the same people mischaracterizes his testimony in such a way as to potentially deprive him from establishing persecution on account of a protected ground.

Furthermore, we can divine nothing in the record supporting the BIA's finding that Chavarria's name did not become known to any people involved in the incident. In fact, we find ample evidence directly contrary to this claim, including Chavarria's above quoted testimony. The fact that, according to Chavarria, the same people involved in the attack were surveilling Chavarria and his house is ample proof that the attackers did, indeed, know who Chavarria was and what he did. Indeed, the BIA seemed to recognize the impact of just such

28

evidence in its first opinion, wherein it stated that "the surveillance following his intervention on the behalf of the human rights members in 1992 was likely on account of an imputed political opinion." Its reversal of its own initial finding is arbitrary because it lacks any support in the record. We are compelled by the record, consisting of credible, uncontradicted testimony, to find that the surveillance was carried out by the same paramilitaries involved in the attack on account of an imputed political opinion that Chavarria was associated with CONAVIGUA.

Erroneous and unsupportable factual findings, however, may not require reversal if they were not prejudicial. Here, taking the facts as Chavarria testified to them, we agree with the BIA that the surveillance of Chavarria does not rise to the level of past persecution. Guided by our recent opinion in *Li*, the surveillance, even if considered a threat, was neither highly

29

imminent nor menacing enough to rise to the level of persecution.

The BIA then proceeded to address the more troubling threat made to Chavarria. While calling it a "frightening crime," the BIA found that it was not related in any way to the earlier attack on the CONAVIGUA members. In support of this conclusion, The BIA characterized the incident this way: "[h]e was warned not to move for 5 minutes and threatened with death if he told what happened." Again, we find that this description mischaracterizes and understates, in a material way, the nature of the incident. In his testimony describing the event, Chavarria stated, "he told me that if we see you again, you're not going to even live to tell the story." Moreover, in a sworn affidavit in the record, Chavarria further elaborates:

> One afternoon near my house...they drove a car in front of my car. Next thing I knew I was in the back seat of the car. They had a gun with a knife to my head...one sat

30

> in the passenger side of the car, while another sat right next to me. They took all the money I had from my pockets..The person that was pointing at me, the one by the driver's side took the keys from the car and said some words that I will never forget, "We are going to leave you alone today, but if we ever catch you again you won't live to talk about it."

The statement actually given by Chavarria in his testimony, fairly taken with the rest of the record, differs starkly with the BIA's characterization and does not lead to the conclusion that the incident was entirely random and unrelated. Rather, it suggests, quite unequivocally, that the robbery was an attempt to suppress information the attackers knew Chavarria had about the CONAVIGUA attack. The statement "[w]e are going to leave you alone today, but if we ever catch you again you won't live to talk about it" is about as clear a death threat as we might expect attackers to make. Substantial evidence does not support the BIA's conclusion that the attackers threatened Chavarria

31

with death because they had just robbed him.    Lending more support to our conclusion, the method of attack mimicked the attack perpetrated upon the CONAVIGUA members. There, the attackers tried to make their attack look like a robbery, taking the money of the women and threatening to kill them.  It simply does not make contextual sense to conclude that this statement relates to the robbery as it was happening, and only a tortured reading of it could lead to this conclusion.

Here, the second threat experienced by Chavarria rises to the level of past persecution because it was both highly imminent, concrete and menacing and Chavarria suffered harm from it.  In addition, the threat was carried out on account of an imputed political opinion that Chavarria was supportive of the CONAVIGUA movement.  This threat is unlike the threats we encountered in *Li*, which were merely verbal and not concrete because here, the attackers actually robbed Chavarria, pointed

32

a gun to his face, and threatened him with death if he told his story.

### C. Well-Founded Fear of Future Persecution

To establish a well-founded fear of persecution, an alien must show that his fear is "subjectively genuine and objectively reasonable." An alien, therefore, must "show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." *Abdille v. Ashcroft*, 242 F.3d 477, 496 (3d Cir. 2001). In addition, this persecution must be on account of a statutorily protected ground which includes imputed political opinion. *Lukwago*, 329 F.3d at 174. While not always the case, an alien may succeed in demonstrating fear of persecution on account of imputed political opinion solely by testifying credibly that a specific political opinion has been imputed to him by a foreign government. *Mulanga v. Ashcroft*, 349 F.3d 123, 133 n.7 (3d

33

Cir. 2003). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution, as long as that fear is related to the past persecution. 8 C.F.R. § 1208.13(b)(1). In addition, while past threats may not rise to the level of past persecution, they are often quite indicative of a danger of future persecution. *Li*, 400 F.3d at 165, n.3.

We have held that an alien may use testimonial, documentary, or expert evidence to demonstrate either a subjective or objectively reasonable fear of future persecution. *Lukwago v. INS*, 329 F.3d 157, 177 (3d Cir. 2003). Moreover, we recognized that often an alien would be unable to offer anything more than his testimony in support of his claim that his fear of persecution is objectively reasonable. Thus, "an applicant's credible, persuasive, and specific testimony may suffice to establish an objective fear of persecution." *Id.*

34

(quoting *Balasubramanrim v. INS*, 143 F.3d 157, 165 (3d Cir. 1998)). The offered testimony need not demonstrate that the persecution would be more likely than not, or even probable. Instead, we only require that the evidence demonstrate that the fear is objectively reasonable. For example, applying these standards in *Lukawago*, we found that the alien established a well-founded fear of persecution where he testified credibly that he feared being killed by the guerilla army from which he escaped if returned to Uganda. Combined with evidence that the guerilla army did kill escaped soldiers we held that the alien had met his burden of proving an objectively reasonable fear of future persecution. *Id*. at 179. Other Circuits are in accord with our requirement that the objective element need only be reasonable and may be substantially met by credible testimony. In *Martirosyan*, the Court of Appeals for the Ninth Circuit held that credible testimony, corroborated by articles and press

35

reports documenting exactly the fear to which the alien testified, along with no contrary evidence in the record established an objectively reasonable fear of future persecution. *Martirosyan v. INS*, 229 F.3d 903, 910-11 (9th Cir. 2000).

We think it clear that here Chavarria has established a well-founded fear of future persecution and that the BIA's one sentence dismissal of this claim was both grossly inadequate and erroneous.[9] As an initial matter, Chavarria's fear, if well-founded, is clearly on account of an imputed political opinion. Since we are required to assess the motive and perspective of the persecutor to establish whether the persecution was or will be on account of political opinion, we can rely on credible testimony of the alien, since it would be "patently absurd to expect an applicant...to produce [] documentary evidence ... because

---

[9.]In its entirety, the BIA concluded that "[n]or has the respondent in anyway shown that his anonymous involvement in this incident might result in harm upon his return to Guatemala."

36

persecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Id*. at 912-13. Here, Chavarria testified that, before the first incident with the CONAVIGUA women, he was essentially apolitical. As we noted earlier, he then offered substantial and compelling testimony that after the incident he was put under surveillance by the same men who perpetrated the attack on the CONAVIGUA women. There is no evidence casting any doubt on this testimony, and we think it clear that the paramilitaries targeted Chavarria because they ascribed to him an association with the CONAVIGUA group that, at minimum, could be anti-government sympathies.[10]

---

[10.] Indeed, Chavarria's testimony is corroborated by the United States State Department Bureau of Democracy, Human Rights and Labor's Country Report entitled *Guatemala Country Report on Human Rights Practices for 1998* which noted, inter alia, that, "between May and July, CONAVIGUA, an NGO representing widows of victims of the internal conflict, reported

(continued...)

37

In an attempt to establish a well-founded fear of future persecution, Chavarria testified credibly that he subjectively feared that if forced to return to Guatemala, he would be harmed or killed. Since it is well settled that credible testimony that an alien fears persecution if returned to his home country establishes a subjective and genuine fear of persecution, we have no trouble accepting Chavarria's testimony in support of his claim. *See Martirosyan*, at 910.

Lastly, Chavarria's "credible, direct, and specific" testimony, corroborated by articles in the record, establishes his fear that he will be persecuted if returned to Guatemala as objectively reasonable. Chavarria testified that, based on what he'd seen happen to the two CONAVIGUA women, combined

---

[10.](...continued)
receiving a number of threatening telephone calls, and several of its members reported having been watched, followed, or harassed."

38

with the fact that he saw the same men surveilling his house led him to fear for his life. Moreover, after his attack in the car, he believed that if he remained in Guatemala, he would be killed. From the record, it is clear that the Guatemalan government and paramilitaries attack and threaten human and civil rights groups. The record also contains direct corroborating evidence that members of CONAVIGUA have been attacked because of their affiliation with the group. Even the State Department Report documents that human rights groups suffer threats and violence from security forces. The Report goes on, "[a]mong other human rights activists in rural areas who were victims of violence during 1996 were ... Lucia Tiu Tum, a member of the Guatemalan Conference of Widows (Conavigua), who [was] killed while returning from a wedding in a remote Quiche village." Indeed, the fact that this entire asylum claim began with Chavarria's help during an attack on two CONAVIGUA

39

members offers clear objective evidence that the government will attack individuals associated with CONAVIGUA. Finally, there is no evidence in the record to support a contrary conclusion which, in any event, must rely on substantial evidence. Here, the BIA's conclusion that Chavarria cannot establish a well-founded fear of future persecution is not supported by substantial evidence. The BIA does not, and likely could not, articulate any evidence whatsoever for this position.

## IV. Conclusion

Because the BIA accepted Chavarria's testimony as true, but then proceeded to misstate and ignore certain relevant aspects of that testimony, its decision that Chavarria's past experiences did not rise to the level of past persecution or that he could not establish a well-founded fear of future persecution are not substantially supported by the record. We hold that Chavarria did establish a claim for past persecution and that, in

40

addition, he established a well-founded fear of persecution. Accordingly, we will grant the petition and reverse the BIA's opinion.