**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-3565
_____

BOB LUPINI NSIMBA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a Final Order of the
Board of Immigration Appeals
(BIA – 1: A213-235-413)
Immigration Judge: Pallavi S. Shirole

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a):
on July 12, 2021
_____

Before: McKEE, GREENAWAY, JR., and RESTREPO,
*Circuit Judges*.

(Opinion Filed: December 22, 2021)

Valentine A. Brown
Duane Morris LLP
30 S. 17th Street
Philadelphia, PA 19103
        *Counsel for Petitioner*

Dawn S. Conrad
Stephen Finn

United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

*Counsel for Respondent*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*.

Bob Lupini Nsimba petitions for review of a December 8, 2020 decision of the Board of Immigration Appeals affirming the Immigration Judge's denial of his application for asylum. In affirming that decision, the BIA misapplied and misinterpreted controlling precedent and imposed requirements on those seeking relief that would require petitioners to first endure torture or arrest. Accordingly, for the reasons that follow, we will grant the petition for review, vacate the ruling of the BIA and remand for further proceedings consistent with this opinion.

## I.     Background

Nsimba was born in the Democratic Republic of the Congo ("DRC" or "Congo") in 1992.[1] His parents died when he was very young, and he was raised by his aunt.[2] His wife and his two children still live in the DRC.[3]

Nsimba became actively involved in Congolese politics in 2011 when he joined the largest political party there, the Union for Democracy and Social Progress ("UDPS").[4] The UDPS opposed the policies of then-President Joseph Kabila. In 2018, when it became apparent that the head of the UDPS, Felix Tshisekedi, and Kabila were

_____

[1] AR 297.
[2] *Id.* at 297–98.
[3] *Id.* at 164.
[4] *Id.* at 299.

conspiring to ensure that Tshisekedi would succeed Kabila in the upcoming 2018 elections, Nsimba left the UDPS. Upon leaving, he co-founded a political and social networking group named Liberté Congolaise, along with a man named Fabrice. The two formed the organization for the express purpose of opposing the presidential regime of Joseph Kabila.[5] Nsimba was also an active participant in political demonstrations opposing Kabila and Tshisekedi.

Tshisekedi did, in fact, succeed Kabila as president in an election in December 2018.[6] Nsimba's work in opposition to Tshisekedi included disseminating anti-government political materials and videos of peaceful protestors being shot by the ruling party.[7] Nsimba also personally attended demonstrations where a protestor was shot because of his opposition to Kabila's regime.[8]

In 2019, Nsimba began to be personally targeted for his protest activities. On June 30, 2019, after a demonstration in Kinshasa against the policies of newly elected President Tshisekedi, Nsimba learned that Fabrice disappeared after being arrested.[9] Two days later, police came to Nsimba's home to arrest him.[10] However, Nsimba was not home when they came. After forcefully entering his home and unsuccessfully searching for him, the police informed Nsimba's family that they intended to arrest him.[11] Later that day, Nsimba escaped to the town of Muanda where he was able to hide in his aunt's home. Muanda is located about 620 km (385 miles) away from Kinshasa.[12]

Even after Nsimba's escape to Muanda, police continued to pursue him. The National Criminal Police Committee issued written convocations (i.e., summonses) for him to appear on a certain date before a criminal police

---

[5] *Id.* at 300–01.
[6] *Id.* at 300.
[7] *Id.* at 301.
[8] *Id.* at 307.
[9] *Id.* at 302.
[10] *Id.* at 303.
[11] *Id.* at 153, 303.
[12] *Id.* at 303.

officer.[13] In addition, Nsimba subsequently learned that the police also issued summonses at his house, and representatives of the State returned to his family home on numerous occasions to carry out their threats of arrest.[14]

Nsimba subsequently fled to the United States, after less than two months of hiding at his aunt's house in

---

[13] *Id.* at 325–31.

[14] *Id.* at 325–31, 364–66. The BIA goes to some lengths to note that the government issued a "summons" rather than an arrest warrant, but it offers no authority to support its assumption that what is termed a "summons" or "convocation" under Congolese law is less authoritative or threatening than the warrants familiar to us. The BIA states:

> We further note that although [Nsimba] claims on appeal that the DRC government issued "multiple arrest warrants" for his arrest, the evidence [he] submitted . . . shows that summonses – not arrest warrants – were issued by the DRC police. Specifically, [Nsimba] submitted phone transcripts from the person who sent the summonses to his attorney, which indicates that they are summonses, not arrest warrants, which are different, but the individual's friend told him that there was an arrest warrant for [Nsimba's] arrest. Notably, the summonses do not indicate why [Nsimba] was required to appear at the DRC's police headquarters.

*Id.* at 6 (citations omitted). We have no idea what authority the BIA relies upon in assuming a legal distinction between a summons and a warrant under Congolese law. It appears to merely assume that the distinction is the same as recognized in the law of the United States. Our conclusion in that regard is reinforced by the fact that the BIA thought it was "notable" that the summonses did not give Nsimba notice of why he was to appear. It is surprising and disappointing that the BIA would believe it notable that a regime that shoots and jails opponents does not bother to inform people why they are to report to police headquarters. This is yet another troubling aspect of the BIA's analysis.

4

Muanda.[15]  He managed to flee by exploiting personal contacts and bribes.[16]  While at the airport in Kinshasa, as he was in the process of fleeing to the United States, a member of the customs and immigration group there warned him "never plan to return to the Congo." [17]

## II.    Discussion[18]
### A. Asylum

To establish asylum eligibility, noncitizens must show they are "unable or unwilling to return to" their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[19]  The persecution must be demonstrated by either events they have suffered in the past or through a showing that they have a well-founded—meaning, subjectively genuine and objectively reasonable—fear of future persecution if they return to their home country, or both.[20]  Noncitizens seeking asylum must

---

[15] *Id.* at 304–05.

[16] *Id.*

[17] *Id.* at 307.

[18] The BIA had jurisdiction pursuant to 8 C.F.R. § 1003.1(b)(3).  We have jurisdiction pursuant to 8 U.S.C. § 1252(a).  *Blanco v. Att'y Gen. United States*, 967 F.3d 304, 310 (3d Cir. 2020).  We review the Board's factual findings for substantial evidence and review its legal determinations de novo.  *Id.*

[19] 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B).

[20] *Chavarria v. Gonzalez*, 446 F.3d 508, 520 (3d Cir. 2006); *N.L.A. v. Holder*, 744 F.3d 425, 431 (7th Cir. 2014).  The Immigration Judge found Nsimba's testimony regarding his subjective fear of future persecution credible and the BIA implicitly accepted that finding.  AR 5–6, 84.  Credible testimony by an applicant of his or her subjective fear of future persecution is enough to satisfy the subjective component that is required to support such a well-founded fear.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987).  Therefore, since Nsimba is relying upon his fear of future persecution in this appeal, rather than pursuing a claim of past persecution, we need only discuss whether his fear of future persecution is

5

also show that the government in their home country either committed the persecution or was unable or unwilling to control the persecutor and that they cannot safely relocate if returned.[21]

## B. Pattern or Practice of Persecution & Individualized Risk

One may establish an objectively reasonable fear of future persecution by demonstrating either an individualized risk of persecution or a pattern or practice of persecution of similarly situated individuals.[22] Here, the Immigration Judge acknowledged "concerning" conditions within the DRC for those who politically oppose the government, but denied relief.[23] They were "concerning" to say the least. The Country Conditions Report that was introduced discussed how political prisoners in the DRC were routinely abused, tortured, and subjected to violence.[24] The record also established a pattern or practice of persecution against those similarly situated to Nsimba. Many of Nsimba's fellow political protestors were shot and, as noted earlier, the person who co-founded Nsimba's political organization with him was arrested and then disappeared into the bowels of a Congolese prison. Moreover, it is beyond dispute that the DRC has a history, pattern, and practice, of persecuting political objectors.[25]

The evidence here established not only that Nsimba was similarly situated to other political activists who had

objectively reasonable. Nsimba's own testimony and documentary evidence may establish that his fear of future persecution is objectively reasonable. *Lukwago v. Ashcroft*, 329 F.3d 157, 177 (3d Cir. 2003) ("An applicant may use testimonial, documentary, or expert evidence to show both a subjective and an objectively reasonable fear of future persecution.").

[21] *Chen Yun Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002), *superseded on other grounds by* 8 U.S.C. § 1158(b)(1)(B)(iii).

[22] 8 C.F.R. § 1208.13(b)(2)(iii)(A).

[23] AR 84.

[24] AR 254–326, 429–40, 533-675, 713–24.

[25] *Id.* at 674–785.

disappeared, been arrested and/or shot. It also established that Nsimba faced an individualized risk of persecution by the Congolese government for his political opinions. Over an extended period of time, the government of the Congo sought to arrest him, and he certainly had reason to believe it was for both his leadership in Liberté Congolaise and his associated political activities opposing the government. That is undisputed.

## C. Reasonable Fear of Future Persecution

Based on the arguments before the BIA, we need only decide if Nsimba has established an objectively reasonable fear of future persecution based upon his political opinion. The BIA determined that he had not satisfied that burden, but its analysis is both troubling and puzzling. It is uncontested that before he fled to safety, the police threatened to arrest Nsimba and went to his house to search for him a number of times—forcibly entering at least once. It is also uncontested that Fabrice, who co-founded an organization that opposed the regime in the DRC along with Nsimba, disappeared after being arrested. In the hearing before the Immigration Judge, the government did not dispute that Nsimba had attended demonstrations where police had shot some of the demonstrators. Nsimba also credibly testified that when fleeing the country, a government official told him never to return. Nsimba quite reasonably interpreted that as a threat.

Yet, the BIA somehow concluded that someone in Nsimba's situation could not have an objectively reasonable fear of persecution if returned to the Congo. The BIA attempted to explain its bizarre conclusion by cherry-picking evidence rather than viewing the entirety of the record, and also by conjecture that minimized the threat Nsimba was under by using unsupported assumptions to minimize the importance of the documents police tried to serve on him.[26] The BIA noted that "although [Nsimba] testified that the police threatened to arrest him, [he] was never arrested and neither he nor any of his family members were ever

---

[26] *See* note 14, *supra.*

7

physically harmed in any way by anyone in the DRC."[27]
After citing some of our precedential opinions as authority,
the BIA continued:

> The Immigration Judge correctly found that
> [Nsimba] has not shown an objectively
> reasonable possibility that he will be subjected
> to future harm as [he] has not presented
> sufficient evidence which demonstrates that the
> police or any government official is presently
> searching for him in the DRC or that he will be
> targeted for harm there.[28]

Before discussing the BIA's misapplication of the
authority it relied upon, it is important to note that Nsimba
did not have to show that police were currently actively
searching for him in order to have a reasonable fear of future
persecution. It is only by virtue of his being away from home
when the police first came for him, and the fact that he could
hide at his aunt's home hundreds of miles away, that he was
able to escape the country without being arrested. Police
returned to Nsimba's home to search for him and issued a
summons for him in an effort to take him into custody.
Moreover, even if the DRC police have finally realized
Nsimba may have fled and they abandoned their search for
him, nothing in this record suggests that police would no
longer be interested in him if he returned.

Instead, the record suggests that the police are waiting
for Nsimba to return. Nsimba credibly testified that when
police came for him *a few days after arresting Fabrice*,
"[they] told his family that he had been identified as an
opponent to the government and they would find and arrest
him."[29] The BIA's reasoning would require someone who
becomes a target of a repressive regime to "shelter in place"
and actually be arrested, and then hope for an impossible
escape, before fear of future persecution would become
objectively reasonable. But, of course, had Nsimba been
arrested he would most certainly have fared no better than

---

[27] AR 4.
[28] *Id.* at 5.
[29] *Id.* at 83.

Fabrice; most likely, Nsimba would not have been heard from again either.

Similarly, the law does not require that family members be seized or tortured in order for an asylee to have a reasonable fear of persecution upon return to his or her homeland. Neither the fact that police *may* have since stopped looking for Nsimba, nor the fact that police did not seize a family member instead of Nsimba, preclude finding that Nsimba's fear of returning was reasonable. Indeed, the fact that family members were not arrested may well support Nsimba's fear of future persecution on account of his opposition to the regime. After all, there is nothing to suggest that any of his family members opposed the regime or that anyone in authority had identified any member of his family as a political enemy.[30]

One final observation about the BIA's analysis deserves mention before we discuss the BIA's misapplication of our precedent. In explaining why Nsimba's fear of future persecution was not reasonable, the BIA stated: "[Nsimba] resided for 2 months at his aunt's home without harm following the police's attempted arrest, and he was able to obtain a passport in his own name and leave the country without arrest[.] [This] undercuts the objective reasonableness of his fear of future persecution."[31] But of course, that is a non sequitur. Nsimba credibly testified that he was able to do this only by bribing officials and exploiting some of his personal contacts. The fact that he was able to obtain a passport in his own name and leave, despite customs agents apparently knowing he was wanted (they warned him never to return), merely reinforces the evidence of the corrupt nature of the regime. It does not negate the reasonableness of

---

[30] It must also be remembered that family members who remain subject to oppressive regimes may themselves be in danger if they attempt to communicate with one who has fled the country, as has been the case here. *See* AR 153 (Nsimba explaining during his removal proceedings that police "entered the house by force and they went through every single piece of the house to see if they could find me there. God is great that they did not rape my wife and my cousin like the other[] [police] do to other women.").

[31] AR 5.

his fear of returning. His subjective fear is not unreasonable simply because he has some contacts in the DRC and may also be able to pay additional bribes to forestall arrest or torture if he is returned. His contacts and bribes were insufficient to forestall a summons being issued for his arrest and they did not prevent police from forcing their way into his home to search for him. The continued existence of any such contacts and his possible ability to pay additional bribes simply does not mean that his fear of returning is unreasonable. Moreover, none of the cases cited by the BIA are to the contrary.

The BIA cited *Herrera-Reyes v. Attorney General of the United States*, [32] in which we held that the BIA had erred in not considering the aggregate effect of an asylum applicant's mistreatment. The BIA attempts to distinguish that case because Nsimba "was never arrested and neither he nor any of his family members were ever physically harmed."[33] We have already explained that the law does not condition asylum upon first "sheltering in place" until actually being arrested. It is difficult to understand why the BIA would believe that one could not have an objectively reasonable fear of future persecution without having first been arrested. It is the grim reality of oppressive regimes that few, if any, of those arrested are ever able to escape captivity, let alone the country, so that they can subsequently seek asylum. Moreover, in *Herrera-Reyes*, we concluded that the Immigration Judge erred in holding that the petitioner had not suffered past persecution pursuant to the asylum statute by finding "it dispositive that [p]etitioner herself 'was never physically harmed' and 'never arrested or imprisoned.'"[34] It should therefore have been clear that if past persecution can be established without any showing of physical harm or arrest, fear of future persecution can be reasonable without any such showing.

We have also explained that "past persecution requires more than considering whether individual incidents are sufficiently 'extreme'; it requires meaningful consideration of

---

[32] 952 F.3d 101 (3d Cir. 2020).
[33] AR 4.
[34] 952 F.3d at 109.

10

whether their aggregate effect poses a 'severe affront[ ] to the [petitioner's] life or freedom.'"[35]  Here, rather than focusing on Nsimba's ability to avoid the fate of his co-founder, Fabrice, the BIA should have focused on whether the totality of circumstances Nsimba faced, including Fabrice's disappearance, the police shooting participants at an anti-regime demonstration, and the fact that police had come searching for Nsimba, were enough to establish that his genuine fear of persecution if returned to the DRC was reasonable.  Clearly, the escalating pattern of mistreatment toward both Nsimba and others was "concrete and menacing."[36]

Yet, as we have had to clarify numerous times before,[37] "the BIA's analysis does little more than cherry-pick a few pieces of evidence, state why that evidence does not support a well-founded fear of persecution and summarily conclude that [Nsimba's] asylum petition therefore lacks merit.  That is selective rather than plenary review."[38]  It is more akin to the argument of an advocate than the impartial analysis of a quasi-judicial agency.

The BIA also relied upon *Chavarria v. Gonzalez*[39] and *Fei Mei Cheng v. Attorney General of the United States*,[40] but neither of them support the BIA's decision.  In fact, a fair and

---

[35] *Id.* at 110.

[36] *Id*. at 107–08, 110–12.

[37] *See Kang v. Att'y Gen.*, 611 F.3d 157, 167 (3d Cir. 2010) ("[T]he BIA ignored overwhelming probative evidence . . . its findings were not reasonably grounded in the record and thus . . . [t]he BIA's determination was not based on substantial evidence.''); *Gallimore v. Att'y Gen.*, 619 F.3d 216, 221 (3d Cir. 2010) (holding that ''the BIA's analysis in all likelihood rests on an historically inaccurate premise . . . the BIA's opinion fails adequately to explain its reasoning and, in any event, appears incorrect as a matter of law.''); *Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 229 (3d Cir. 2011) (finding the BIA ''erred by misapplying the law regarding when corroboration is necessary . . . .'').

[38] *Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010).

[39] 446 F.3d 508 (3d Cir. 2006).

[40] 623 F.3d 175 (3d Cir. 2010).

objective reading of those cases would have informed the BIA that Nsimba was entitled to the relief he is seeking.

In *Chavarria*, we concluded that the petitioner's testimony was sufficient to establish a "well-founded fear of future persecution."[41]  In doing so, we explained: "[t]he offered testimony need not demonstrate that the persecution would be more likely than not, or even probable.  Instead, we only require that the evidence demonstrate that the fear is objectively reasonable."[42]

Our decision in *Fei Mei Cheng* is not nearly as helpful to our analysis here as our decision in *Chavarria*.  It is also not nearly as supportive of the BIA's analysis as that agency believes.  *Fei Mei Cheng* was primarily concerned with whether actions taken by Chinese officials to enforce China's "one child policy" amounted to past persecution.  We were particularly concerned with whether forced insertion of an IUD was tantamount to torture.  The discussion is therefore not that useful in determining the existence of a reasonable fear of future persecution under the circumstances here.  Nevertheless, we still emphasized that "[t]he cumulative effect of the applicant's experiences must be taken into account because [t]aking isolated incidents out of context may be misleading."[43]  That is exactly what happened here.

The BIA also relies in part upon our nonprecedential decision in *Jian Ming Wu v. Attorney General of the United States*.[44]  There, the petitioner did not establish a well-founded fear of future persecution in part because "he traveled to his hometown [following his release from detention in China] where he remained unharmed without contact from the authorities for three months before leaving China."[45]  Here, Nsimba did not travel to his hometown—he escaped to a place of safety 385 miles away.  Moreover, *Jian*

---

[41] 446 F.3d at 522.

[42] *Id.* at 520.

[43] *Fei Mei Cheng*, 623 F.3d at 192 (quoting *Manzur v. Dep't of Homeland Sec.*, 494 F.3d 281, 290 (2d Cir. 2007) (alterations in original) (internal quotation marks omitted).

[44] 219 F. App'x 217 (3d Cir. 2007).

[45] *Id.* at 219.

*Ming Wu* is of tenuous relevance at best. In addition to being nonprecedential, its holding does not mitigate the fact that the BIA simply failed to view the totality of circumstances that were the foundation of Nsimba's fear of returning to the DRC.[46]

There is simply no way that the fair and objective reading of this record that the law requires can support a conclusion that Nsimba has not established that his fear of returning to the DRC was objectively reasonable.

**D. Physical Harm Not Required**

*Evidence of physical harm was not required to establish fear of future persecution.* The Immigration Judge and BIA erred in holding otherwise. As we have stressed, but apparently must emphasize yet again, we have never required someone to actually subject themself to physical harm or arrest before finding that his or her fear of returning to a country is reasonable. Merely stating such an absurdity demonstrates how illogical and impractical such a requirement would be.[47] The contrary proposition (which the BIA relied upon here) is so unreasonable that it should have been self-evident to any neutral tribunal. Yet, despite the compelling record here of an objectively reasonable subjective fear of persecution if returned to the DRC, the BIA denied relief in part because Nsimba failed to establish any

---

[46] Although we have chosen to address the nonprecedential opinion in *Jian Ming Wu* to illustrate the weakness of the BIA's reliance on that nonprecedential decision, we emphasize that our Internal Operating Procedures clearly explain that nonprecedential decisions are not intended as precedent and should not be treated as such. *See* 3d Cir. I.O.P. 5.7 (2018); *see also In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006) (including a fuller explanation of the limited role of our nonprecedential opinions).

[47] We have made clear that physical harm is never required to establish past persecution or a well-founded fear of future persecution. *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 110 (3d Cir. 2020); *see also Li v. Att'y Gen.*, 400 F.3d 157 (3d Cir. 2005) (finding a suffering of economic past persecution, in the absence of physical harm is sufficient to establish persecution).

13

physical harm to himself or his family.[48]  We take this opportunity to reiterate, no such harm is required for relief, and—as we have explained above—the cases the BIA relied upon here are not to the contrary.  As discussed, as recently as last year, we clarified in *Herrera-Reyes* that "[w]e have never reduced our persecution analysis to a checklist or suggested that physical violence—or any other single type of mistreatment—is a required element of the past persecution determination."[49]  A refugee who reaches our borders need not bear the scars or disfigurement or mutilation to establish an objectively reasonable fear of returning home.

This record therefore compels a finding that the risks Nsimba faced upon return to the DRC were sufficient to give rise to an objectively reasonable fear of future persecution.[50] Police attempted to capture him.[51]  Had he fallen into police custody, common sense should have been all the authority necessary to conclude that he would likely have endured physical harm or worse.  Just two days before the arrest attempt of Nsimba, Fabrice—Nsimba's co-leader of Liberté Congolaise—was arrested and disappeared.  No "ordinary person of average intelligence and sound mind would believe" that the police were not intent on arresting and harming Nsimba as a political opponent.[52]

As we have already noted, the BIA also relied upon the fact that Nsimba remained in the country without harm for almost two months at his aunt's home after the first attempted arrest.[53]  As discussed above, the BIA seems to have misread or misunderstood our cases in reaching this conclusion.  The BIA also concluded, and the government argues, that Nsimba's ability to obtain egress through bribery undermines his claim for relief.[54]  However, the very fact that Nsimba was

---

[48] AR 4–6.

[49] 952 F.3d at 110.

[50] *See Chavarria v. Gonzalez*, 446 F.3d 508, 520–21 (3d Cir. 2006) (finding that physical harm was not necessary for petitioner to qualify for a fear of future persecution).

[51] AR 325–31, 364–66.

[52] *Reasonable Belief*, Black's Law Dictionary (2d ed. 1910).

[53] AR 5.

[54] *Id.* at 5–6; Respondent Brief at 6–8.

forced to use a substantial portion of his savings to escape arrest, torture and possible death corroborates his fear of persecution, it in no way undermines or mitigates it. And a fair reading of this record would readily have established that.[55] Nsimba's need to commit his life savings to a desperate bribery scheme in order to secure his safety further establishes the insecurity and future persecution he would have faced in the Congo had he remained, as well as the corrupt nature of the regime he fled from.[56]

---

[55] Petitioner Reply Brief at 8 ("To leave the country, he put his trust and his life savings in an intermediary that was able to bribe officials to obtain the needed visa and to not arrest him when he passed through the Congo airport."); AR 304–05 (explaining that Nsimba paid a total of $6,700 to an intermediary to obtain a visa to leave the DRC). Nsimba's payment of $6,700 was more than six times the annual gross national income per capita in the DRC. *See* UNITED NATIONS DEVELOPMENT PROGRAMME HUMAN DEVELOPMENT REPORTS, *Gross national income (GNI) per capita (constant 2017 PPP$)*, *available at* http://hdr.undp.org/en/indicators/195706 (last visited Nov. 21, 2021).

[56] The BIA also misapplied the cases it cited to support its conclusion that Nsimba's ability to obtain a passport in his own name and leave the country without arrest goes against his persecution. In *Wei Ye v. Attorney General of the United States*, 708 F. App'x 75 (3d Cir. 2017), we rejected a claim of a well-founded fear of persecution in the future because the petitioner did not present evidence that the police continued to look for him after an initial arrest, and he was, in fact, "able to leave China with his own passport without any difficulty." *Id.* at 77 (alteration in original). Here, Nsimba clearly faced difficulty leaving the Congo—he paid a bribe to flee the country and was threatened by a government official to "never plan to return to the Congo." In *Sumadatha v. Ashcroft*, 111 F. App'x 125 (3d Cir. 2004), we similarly concluded the petitioner did not have a well-founded fear of future persecution because he was able to live in Indonesia for two years immediately prior to his arrival to the United States, *in which time he amassed a sizable wealth* in Indonesia and was able to obtain a passport in person from the city from which he

15

**E. Relocation**

Before concluding, we want to address the BIA's misguided reliance on the fact that Nsimba's ability to hide at a relative's house over 300 miles from his home somehow diminishes the objective reasonableness of his fear of future persecution.

The law is clear that an asylum "applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so."[57] The BIA relied in part upon the fact that Nsimba was able to live within the DRC and escape capture when concluding that he could not establish a well-founded fear of persecution.[58] This is a clear error of law on this record.

Nsimba testified that he could not remain in his aunt's house indefinitely because it stands in "the same country" in which his life is in danger.[59] His credible testimony established that indefinite hiding at his aunt's house was not a solution.[60] In theory, anyone could successfully hide from authorities in even the most repressive regime. Although it should be obvious, we take this opportunity to inform the BIA

---

purportedly fled. Additionally, the petitioner's asylum application in *Sumadatha* claimed persecution based on his religion (Hinduism) and minority status as an Indonesian man married to an ethnically Chinese woman, but there was no indication in the State Department reports that Hindus or Indonesians married to ethnically Chinese persons are targeted in any way. *Id.* at 128. Here, the applicable country conditions report confirms that political opponents are targeted and tortured in the DRC. Also, *Nsimba attended his in-person passport interview months prior to the arrest of Fabrice and before the time when he began receiving threats from police.* Further, prior to his arrival in the United States, and contrary to the petitioner in *Sumadatha*, Nsimba remained in hiding while the police actively searched for him.

[57] 8 C.F.R. § 208.13(b)(2)(ii).

[58] AR 5.

[59] *Id.* at 164.

[60] *Id.*; *see also* Petitioner Reply Brief at 5.

that *remaining in hiding is not the same as safely relocating within a country*.

The mere fact that it may be possible for Nsimba to successfully avoid arrest by remaining in hiding for the rest of his life (or the rest of the current regime) does not make his fear of return unreasonable. The very fact that he would have to do so corroborates the reasonableness of his fear of future persecution. Any other conclusion is incompatible with our binding precedent, which has clearly held that an asylum applicant's need to go into hiding supports a finding that s/he could not safely relocate within his or her country.[61] As our sister circuit court of appeals forcefully stated:

> It hardly seems "reasonable to expect" one facing persecution or torture to become a fugitive and live in hiding. But even setting that aside, we do not believe that an applicant can be said to have the ability to "relocate" within her home country if she would have to remain in hiding there. As a practical matter, a living arrangement that involves hiding from the authorities is necessarily impermanent. When used intransitively, "relocate" most naturally refers to resettlement or a change of residence, not the unstable situation of one who must always be ready to flee. Moreover, living in hiding does little to establish that a person is able to "avoid future persecution," or "is not likely to be tortured[.]" To the contrary, a person who lives in hiding does so precisely because she continues to be in danger of being

---

[61] *See Mendoza-Ordonez v. Att'y Gen.*, 869 F.3d 164, 172 n.20, 173–74 (3d Cir. 2017) (stating that "[t]he Immigration Judge was convinced that, since Mendoza lived with his sisters for a period of time after the death threats without any incident, this was sufficient evidence to show that safe relocation was possible" but we found that the record "fundamentally contradict[ed] the Immigration Judge's reasoning and ruling" since "in the context of the entire record, Mendoza's fear and his need to go into hiding ha[d] been amply and compellingly substantiated").

captured and returned to face persecution or torture.[62]

We agree with other circuit courts of appeals "that have held that '[r]elocating to another part of the country does not mean living in hiding.'"[63]  For example, the Fifth Circuit has found "that an alien cannot be forced to live in hiding in order to avoid persecution."[64]  The Seventh Circuit has held that "[i]t is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape persecution . . . by trying to remain undetected."[65]  The Fourth Circuit has concluded that time spent hiding in a village did not support the BIA's finding that the applicant could reasonably relocate internally in the Congo.[66]  And the Second Circuit has found that the BIA erred in concluding that a noncitizen could reasonably relocate within China because his parents demonstrated that such relocation was possible, where parents remained in hiding and were subject to outstanding arrest warrants.[67]

We know of no authority that interprets "*safely relocate*" as a synonym for "relocate," and we refuse the BIA's invitation to ignore that important condition on the reasonableness of one's fear of future persecution following removal.  The asylum law simply cannot be fairly read to require the removed asylum seeker to live in constant fear of arrest, imprisonment, torture, or death.  It does not condemn one to live the rest of his/her life (or try to outlast a repressive regime) fearing every knock on the door—assuming those in authority there even bother with such conventions.  Simply put, if a petitioner can establish a subjective fear that he/she will be in danger returning to his/her homeland based upon a

---

[62] *Akosung v. Barr*, 970 F.3d 1095, 1101–02 (9th Cir. 2020) (internal citations omitted).

[63] *Id.* at 1102 (alternation in original).

[64] *Singh v. Sessions*, 898 F.3d 518, 522 (5th Cir. 2018).

[65] *Holder*, 744 F.3d at 442.

[66] *Essohou v. Gonzales*, 471 F.3d 518, 522 (4th Cir. 2006).

[67] *Chen v. Gonzales*, 169 F. App'x 25, 27 (2d Cir. 2006); *see also* 3 Charles Gordon et al., Immigration Law and Procedure § 33.04(5)(d) (Matthew Bender, Rev. Ed.).

protected characteristic or trait, and such fear is objectively reasonable, then "safe relocation" is not an option.

## III. **Conclusion**

For the reasons we have explained, we will grant the petition for review, vacate the deportation order, and remand for further proceedings consistent with this opinion.