**Olegas KOMAROVAS; Jalena Komovien, Petitioners**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

**No. 05–5384.**

United States Court of Appeals, Third Circuit.

Argued Jan. 17, 2007.

Filed: March 2, 2007.

Dennis Mulligan (Argued), Nationalities Service Center, Philadelphia, PA, for Petitioners.

William C. Minick, Leslie M. McKay, Mark L. Gross, Christopher C. Wang, (Argued), U.S. Department of Justice, Washington, DC, for Respondent.

BEFORE: McKEE, AMBRO and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

Olegas Komarovas and Jelena Komaroviene [1] petition this court for review of a final order of removal of the Board of Immigration Appeals (BIA). We have jurisdiction under 8 U.S.C. § 1252(a)(1). Because we lack sufficient explanation for the rejection of petitioners' claims to permit meaningful review, we will grant the petition for review and remand for further proceedings.

## I

The petitioners are married to each other and lived in Lithuania before coming to the United States on September 10, 2001. They remained in the United States longer than authorized. In removal proceedings before an immigration judge (IJ), petitioners conceded removability, but applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Olegas is ethnically Russian and Ukrainian, and Jelena is ethnically

---

1. The female petitioner's name in the official caption is spelled "Jalena Komovien." We refer to her in this opinion using the spelling of her name that appears consistently in the documentation in the administrative record, including her Lithuanian passport, her notice of appeal, her affidavit, and her daughter's birth certificate. Adm. R. 46, 246, 260, 266, 267, 273.

Ukrainian. According to their affidavits and testimony, since the breakup of the Soviet Union in 1991, both have been victims of discrimination, insults, threats, harassment, and physical abuse in Lithuania because they are not ethnic Lithuanians.

The IJ found that petitioners "provided credible and believable testimony" and that their "claims [were], if anything, somewhat understated." App. at 21. With respect to the four incidents petitioners rely upon as demonstrating past persecution, the IJ observed that they were "consistent with known and evolving country conditions in the former Republics of the Soviet Union," noting in "particular [that] ethnic Russians at times have faced serious problems of discrimination and worse because of" their ethnicity. *Id.* All four of these incidents were found by the IJ to have been motivated, at least in part, by ethnic animosity.

In addition to numerous episodes of verbal abuse and discrimination, petitioners testified to four incidents in the ten months between April 2000 and February 2001, each of which involved some form of threat to the lives of petitioners and/or their child. The first was described by Jelena as follows:

> In April 2000 someone tried to abduct my daughter baby while I was in a food store. I walked away for a moment from the baby carriage—I had asked some women to look after it when I went to get some bread—and when I returned the carriage was gone. I was told that my husband's brother had taken the baby, but that was obviously false. I felt horrible—I was in a panic. I went outside and I saw the baby near the road, in danger of being hit by a vehicle on that busy street.
>
> That evening I received a phone call. The person who called said, "Damn

Ukrainian—get out of Lithuania!" Then, "You should be happy your baby was not killed!" And, "If you report this to the police we will kill your baby." I went to the police to report the incident and threat, but the police did not do anything.

Adm. R. at 247–48.

In May of 2000, someone set fire to petitioners' home and left a handwritten note saying, "Get the hell out of Lithuania, Ukrainian pigs. You make too many babies." Adm. R. at 243. Fortunately, neighbors were able to extinguish the fire. Again the incident was reported to the police and again there was no response.

In September of 2000, as petitioner Olegas was returning home from work in the evening, he encountered two local men, one of whom asked him in Lithuanian for a cigarette. Olegas responded in Russian that he did not have one. The men then attacked him with a knife and beat him "severely." They yelled at him in Lithuanian, "You are Ukrainian! ... Get out! We hate that you have children in our country!" Adm. R. at 243. The encounter ended only when the attackers heard a police siren on a nearby street and fled. Olegas sustained a deep cut on his leg that resulted in a substantial loss of blood and that raised a scar two inches long. He did not seek medical attention because he feared losing his job if he missed work. The incident was sufficiently traumatic for Olegas that he developed a speech impediment and stuttered for three months. He reported the attack to the police, but nothing ever came of it.

Finally, Jelena described a February 2001 incident as follows:

> In February 2001 I returned to my car in a parking lot after visiting friends. Two big men were circling my car. When I asked them what they were

doing they hit me in the stomach and called me "Ukrainian pig." "No matter how many of you we catch and no matter what we do to you, you are still here. We want you to get the hell out of our country. As long as you stay in our country we will get you all the time." What really terrified me was what they said after that: "Next time we are going to get your child." One held me and the other beat me in the stomach with his fists. After this abuse, and after threatening to get me again in the future, they just walked away.

Adm. R. at 248.

■ The IJ found that the incidents petitioners described did not constitute past persecution. He further determined that, although petitioners subjectively feared persecution if they returned to Lithuania, their fears were not "objectively plausible or justified as a matter of law," and on that basis denied their applications for asylum and withholding of removal.[2] App. at 28.

The petitioners appealed to the BIA, and the BIA affirmed without opinion and ordered their removal. The petitioners seek review of that order.[3]

## II

To be eligible for asylum or withholding of removal, the alien must demonstrate that she is unwilling or unable to return to her home country because of persecution or a well-founded fear of future persecution on account of her race, religion, nationality, membership in a social group, or political opinion.[4] *See Lie v. Ashcroft,* 396 F.3d 530, 534–35 (3d Cir.2005); *Gao v. Ashcroft,* 299 F.3d 266, 271–72 (3d Cir. 2002). For asylum purposes, a showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. Withholding of removal is subject to a similar inquiry but a more stringent burden of proof—the alien must establish a "clear probability" that she would suffer persecution if removed, and the Attorney General must grant withholding if the alien qualifies. *See* 8 U.S.C. § 1231(b)(3)(A); *INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). An alien who fails to qualify for asylum is thus necessarily ineligible for withholding of removal. *Ghebrehiwot v. Attorney General,* 467 F.3d 344, 351 (3d Cir.2006); *Janusiak v. INS,* 947 F.2d 46, 47–48 (3d Cir.1991).

2. The IJ also found that there was no credible evidence in the record to support the petitioners' applications for protection under the CAT. The petitioners do not challenge this determination and have therefore waived their CAT claims. *Lie v. Ashcroft,* 396 F.3d 530, 532 n. 1 (3d Cir.2005).

3. When the BIA issues an affirmance without opinion, we review the IJ's opinion and scrutinize its reasoning. *Smriko v. Ashcroft,* 387 F.3d 279, 282 (3d Cir.2004) (citing *Dia v. Ashcroft,* 353 F.3d 228, 245 (3d Cir.2003) (en banc)). The petitioners challenge the IJ's rejection of their applications for asylum and withholding of removal. This court reviews the IJ's findings for "substantial evidence," and will uphold the IJ's decision unless the evidence "was so compelling that no reasonable factfinder could fail to find the alien

eligible for asylum or withholding of removal." *Lie v. Ashcroft,* 396 F.3d 530, 534 n. 3 (3d Cir.2005) (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 480, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).

4. While the statute does not use the word "ethnicity," the BIA has construed "persecution on account of membership in a particular social group" to mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." *In re Acosta,* 19 I. & N. Dec. 211, 233 (B.I.A.1985); *see also Sepulveda v. Gonzales,* 464 F.3d 770, 772 (7th Cir.2006); *Fatin v. INS,* 12 F.3d 1233, 1239–40 (3d Cir.1993). This certainly includes a petitioner's ethnicity. *Negeya v. Gonzales,* 417 F.3d 78, 83 (1st Cir.2005).

To establish past persecution, the alien must show that she was the victim of: (1) an incident or incidents, (2) on account of a statutorily protected ground, (3) committed by the government or by forces the government is unwilling or unable to control. *Gao,* 299 F.3d at 272. The "incident or incidents" must also be sufficiently severe. This court has defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Lie,* 396 F.3d at 536 (quoting *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993)).

While it is clear to us that the IJ concluded that the incidents described by petitioners did not rise to the level of persecution, we are uncertain as to how that conclusion was reached. Early in his analysis, the IJ cited *In re O–Z & I–Z,* 22 I. & N. Dec. 23 (B.I.A.1998), for the following proposition:

> There are times when the significance of the mistreatment that individuals face in the past, both individually and cumulatively, is so invidious and so profound in terms of its impact on the individuals and their families, that collectively the incidents can rise to the level of past persecution when individually they may not.

App. at 23.

In *O–Z & I–Z,* the respondent, a Russian Jew, and his son were the victims of several physical beatings by anti-Semitic civilians, vandalization of their home by anti-Semitic civilians, and written threats of violence if they did not "leave Ukraine to the Ukrainians." 22 I. & N. Dec. at 24.

The BIA ruled that these incidents constituted past persecution and were not merely "isolated acts of random violence" as the INS contended. *Id.* at 26. The physical beatings of the respondent and his son, as well as the assault on their home and the threats upon their lives, were not unlike those experienced by Olegas and Jalena.

The IJ, while acknowledging the holding of *O–Z & I–Z,* did not undertake to distinguish it from the case before him. While taking note that petitioners relied upon four episodes, he dismissed all but the knife attack in single-sentence references.[5] In evaluating whether the knife attack constituted persecution, either alone or in combination with other incidents, the IJ made two findings, the significance of which eludes us.

First, the IJ found that the attack was a "chance encounter" rather than a premeditated assault, and held that this finding was fatal to Olegas's claims:

> It strikes the court, from the nature of [Olegas's] testimony, that the assault on [Olegas] was not necessarily premeditated and planned by any nationalist group that had a preplanned animus to seek out this particular respondent and his family. *Unfortunately* for [Olegas], *it appears to have been a chance encounter* on a dark night with individuals who immediately reacted to hearing the respondent not speak Lithuanian and, therefore, obviously exposing [Olegas] to their racist reaction.

App. at 22 (emphasis added).

Second, the IJ apparently found that the impact of the knife attack on Olegas was not sufficiently severe:

> tory treatment in terms of educational opportunities, as well as a beating that she suffered in a parking lot, having been assaulted by individuals who insulted her because of her Ukranian [sic] background."
> App. at 23.

---

5. *E.g.*
   "There was also the incident where there was the near kidnaping of their baby which, in the Court's view, does not also rise to the level of past persecution. There is also a reference to additional insults as well as a reference in the wife's I–589 to discrimina-

It is certainly possible that individual incidents such as this, if they result in disproportionate physical or psychological consequences, could be sufficient in their intensity and the scope of their impact on an individual victim, that if the incident was motivated in part on the basis of a protective ground, the singular incident would fall within the outer contours of past persecution case law and *[In re] O–Z & I–Z* [22 I. & N. Dec. 23 (B.I.A.1998) ], and *[In re] Chen* [20 I. & N. Dec. 16 (B.I.A.1989) ]. . . .

The reason for this portion of the analysis is simply to conclude that the action taken against the respondent, because it did not have the type of impact on the respondent that was perhaps disproportionate to the literal context of the attack, is not one that the Court can find alone and in combination with the other acts of discrimination and insults that the respondent suffered (even to include the incident with the baby) to be sufficient for a finding of past persecution on the basis of a protected ground.

App. at 25–26.

█ While the relevance of the IJ's "chance encounter" finding would seem probative to us if it came in the context of an analysis of whether petitioners had shown a well-founded fear of future persecution, that finding comes in support of the IJ's conclusion that the knife attack was not serious enough to constitute past persecution. Although our cases distinguish between persecution and random incidents of minor crime, *see, e.g., Lie,* 396 F.3d at 536 ("We agree with the Ninth and Tenth Circuits that Lie's account of two isolated criminal acts, perpetrated by unknown assailants, which resulted only in the theft of some personal property and a minor injury, is not sufficiently severe to be considered persecution."), we have not held that premeditation is a required element of a claim of past persecution.

We are also concerned by the IJ's rejection of petitioners' past persecution claim based on the knife attack "because it did not have the type of impact on the respondent that was perhaps disproportional to the literal context of the attack." App. at 26.

At oral argument, the Attorney General conceded that these findings were "ambiguous" but argued that we should nonetheless deny the petition for review because, in its view, the record does not compel a finding that petitioners suffered past persecution. We disagree. As suggested by *In re O–Z & I–Z,* the correct resolution of the past persecution issue here is not obvious. Olegas was assaulted by two men who were willing to use a deadly weapon on him and who ceased their assault only because of the fortuitous appearance of the police. Jelena's baby was taken from her and put at risk, and Jelena was held by one assailant while she was beaten by another. Their home was set on fire, and their lives, as well as the life of their child, were repeatedly threatened. In this context, we are unwilling to speculate about what caused the IJ to conclude that petitioners' experience did not rise to the level of persecution.

### III

We acknowledge that our standard of review is extraordinarily deferential, and we here express no view regarding the merits of any of petitioners' claims. The availability of the judicial review guaranteed by the INA, however, necessarily contemplates something for us to review meaningfully. *Abdulai v. Ashcroft,* 239 F.3d 542, 555 (3d Cir.2001). Because the BIA's failure of explanation, in the form of an IJ opinion or otherwise, makes it impossible for us to review its rationale, we

will grant petitioners' petition for review, vacate the Board's order, and remand the matter for further proceedings consistent with this opinion.