**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2378
_____

SELVIN HERALDO SABAN-CACH,

                                Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA

_____

On Petition for Review of a Final Order of the
Board of Immigration Appeals
No. A206-689-150
Immigration Judge: Pallavi S. Shirole

_____

Argued: March 2, 2022

Before: McKEE*, AMBRO, and SMITH, *Circuit Judges.*

(Opinion filed: January 25, 2023)

---

\* Judge McKee assumed senior status on October 21, 2022.

Stephanie E. Norton **[Argued]**
Seton Hall University School of Law
Center for Social Justice
833 McCarter Highway
Newark, NJ 07102
        *Counsel for Petitioner*

Merrick B. Garland
John B. Holt
Victor M. Lawrence, I
Jane T. Schaffner **[Argued]**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

————————————

OPINION

————————————

McKEE, *Circuit Judge*.

Based on past experiences, if returned to Guatemala, Selvin Heraldo Saban-Cach fears being persecuted by a local gang because of his identity as an indigenous person. Accordingly, he seeks withholding of removal under the Immigration and Nationality Act and protection from removal under the Convention Against Torture. The Immigration Judge denied his applications and ordered his removal, and the Board of Immigration Appeals affirmed. This petition for review followed. For the reasons that follow, we will grant the petition, vacate the BIA's decision, and remand for further proceedings consistent with this opinion.

**I.**

Saban-Cach was born and grew up in the Montufar neighborhood of Sacatepéquez, Guatemala. He is of Kaqchikel Mayan indigenous ethnicity and was one of the few Kaqchikel

2

living in Montufar.[1] Kaqchikel Mayans stand out from the majority population because of their names, language, physical appearance, and dress.

During Saban-Cach's adolescence in Montufar, a local gang associated with the international MS-13 gang was growing in strength. The gang began to harass and act aggressively toward Saban-Cach, including insulting him based on his ethnicity. Gang members threw stones at him and kicked him. His father stated that "[m]any times [Saban-Cach] came home with cuts and bruises from getting beaten up by [the gang]."[2] Saban-Cach did not report these attacks to the police because of fear of gang retaliation and the belief "that [he] was never going to get any . . . protection from [the police]."[3] The gang's conduct was designed to recruit him into the gang. Gang members warned him: "[W]e're not going to stop attacking you until you're part of us and, if not, until we take your life away. We're going to take your life away if you don't belong to us."[4]

Because of this abuse, around age fifteen, Saban-Cach dropped out of school and fled to San Pedro, Sacatepéquez—about an hour and a half away from Montufar. Despite relocating to San Pedro, the gang still harassed him. He testified that, "[a]fter [he] got out of school they attacked [him] four times,"[5] each time while he was visiting Montufar.

The worst of these attacks occurred when Saban-Cach went to Montufar to visit his parents. Gang members screamed at him until he turned around. They then got in front of him saying, "Damn indigenous, silly indigenous" and reiterating that they would not "leave [him] in peace" until he "belong[ed] to [them]."[6] One of the members then hit Saban-Cach with a glass bottle—breaking it over his right eye—causing him to fall bleeding to the floor. The gang kicked him while he was

---

[1] Saban-Cach testified that he, his grandmother, parents, and siblings were the only indigenous people living in Montufar.
[2] AR 276.
[3] AR 137.
[4] *Id.*
[5] AR 140.
[6] AR 140.

on the ground and stabbed him in the lower back with the broken bottle. He fell unconscious and awoke in his home, covered in blood.

Because the hospital was far away, his grandmother treated his wounds with natural medicines. Saban-Cach showed the Immigration Judge multiple scars from these attacks. These scars are on his right eyebrow, mid chest, right arm, and lower back. After showing the IJ the scars on his right eyebrow and mid chest, Saban-Cach stated, "I have some mark[s] on the arms that you can see pieces of flesh that came out because of all the kicking that I received. And over here . . . I have a very big scar where they inserted, like put in the part of the bottle."[7] As was true of the other attacks, this attack was not reported to the police because Saban-Cach believed that it would be futile. The police did not respond to the complaints of indigenous people.

Saban-Cach also testified that, while he was living in San Pedro, gang members came looking for him on approximately three occasions. After visiting family in his hometown, he reported that the gang followed him back to San Pedro. He spotted three gang members behind him in the street, but managed to hide and, after waiting a long time, lose them. Fearing for his and his family's safety, Saban-Cach decided to leave Guatemala.

He first attempted to enter the United States in April 2014. He was detained at the border, subjected to an expedited removal order, and sent back to Guatemala. He subsequently explained that he did not realize that he could apply for asylum at the time.[8] He also testified that, when he returned to Guatemala, members of the gang continued to stalk and persecute him. This harassment led him to make a second attempt to enter the United States only a month later. He was again detained at the border, removed pursuant to a reinstated

---

[7] AR 142–43.

[8] Saban-Cach testified that he informed immigration officers "what [he] had gone through [and] where [he] lived, and they ignore [sic] it. They never told me anything. I never had access to a Judge. I never had access to anything. Nothing." AR 165.

order of removal, and returned to Guatemala.[9] Back in San Pedro, Saban-Cach continued to face aggression from gang members. By then, the gang had grown in numbers and strength. After a few months, in 2015 Saban-Cach again tried to enter the United States. He was successful, and he entered without inspection or apprehension. He left behind his wife, two daughters, parents, and siblings.

The gang also targeted Saban-Cach's immediate family members. When Saban-Cach was sixteen and was still living in Guatemala, gang members threatened his father, stating, "[Y]our son is against us. You're not welcome either."[10] They beat him in the street and one of the gang members cut him with sharp spines of a plant, drawing blood. Even though Saban-Cach told his father to call the police to report the attack, his father refrained because he "knew that would be pointless or dangerous," as the police discriminated against indigenous people and were paid by the gang.[11]

Saban-Cach testified that, after he left Guatemala, the gang kidnapped, beat, and raped his 16-year-old sister. They held her at a house for more than a month. "The gang members told her that since [Saban-Cach] escaped[, his] family was going to have to pay."[12] This time, his father did make a complaint to the police and even identified the sister's attacker. But, according to Saban-Cach, the police ignored the complaint. Gang members also threatened the lives of Saban-Cach's wife and children. His wife also complained to the police, but again the police did nothing. In 2018, as a result of these experiences, Saban-Cach's wife, father, mother, and sister all fled Guatemala for the United States. His only immediate family member remaining in Guatemala is his

---

[9] Saban-Cach testified that he again informed immigration officers that he was trying to escape his country, but they ignored this information.

[10] AR 276.

[11] AR 276.

[12] AR 267.

younger brother who is currently living in hiding after surviving an attack by the same gang.[13]

The Department of Homeland Security encountered Saban-Cach in New Jersey in 2020 and subsequently issued a Notice of Intent/Decision to Reinstate a Prior Order. After he expressed a reasonable fear of returning to Guatemala, Saban-Cach was placed in withholding-only proceedings and filed an application for withholding of removal and relief under the Convention Against Torture. He thereafter presented his claims in a merits hearing before an IJ.

The IJ found Saban-Cach's testimony credible, explaining that, because of "his responses to questions, [and] his demeanor[,] . . . [he] sufficiently corroborated his claims."[14] Despite this finding, the IJ concluded that Saban-Cach did not establish a clear probability of persecution on account of a protected ground and thus did not qualify for withholding of removal.[15]

The IJ first explained that Saban-Cach had not satisfied his burden of demonstrating that he had suffered harm rising to the level of past persecution. The IJ also concluded that, even if the harm rose to the level of persecution, Saban-Cach had not established that any such persecution was on account of a protected ground.[16] The IJ concluded that "young Guatemalan

---

[13] Saban-Cach's father reported that, despite his other son's attempts to hide, a gang member attempted to run him over with a car.

[14] AR 103.

[15] *See also INS v. Cardoza-Fonesca*, 480 U.S. 421, 430 (1987).

[16] The BIA did not address the IJ's conclusion that Saban-Cach failed to establish he was a member of a cognizable social group and the nexus between the persecution and the group. Rather, it affirmed the IJ's conclusions that Saban-Cach had not established past persecution and that he was able to reasonably relocate. Inasmuch as that was dispositive, the BIA affirmed denial of withholding of removal. AR 5 (citing *Matter of J-G*, 26 I. & N. Dec. 161, 170 (BIA 2013) (stating that courts and agencies are not generally required to

men who are recruited by a gang and publicly refuse to join" are not a cognizable social group because this group is neither particular nor socially distinct.[17] The IJ also concluded that there was insufficient evidence to show that the attacks were motivated by a political opinion. The IJ explained, "while the gang may have sought the respondent's race as being useful to their agenda, the gang only harmed [him] when [he] refused to succumb to those recruitment efforts."[18] Consequently, the IJ concluded that Saban-Cach failed to establish any nexus between a protected ground and future persecution.

The IJ also found that Saban-Cach failed to establish that it would be unreasonable for him to relocate internally if returned to Guatemala. The IJ noted that he had been able to live "without suffering any further physical harm" in San Pedro. The IJ reasoned, "[although] he saw gang members in San Pedro, he was always able to avoid them."[19] The IJ also pointed out that Saban-Cach's brother continued to live in Guatemala. Accordingly, the IJ found that Saban-Cach had not established a well-founded fear of future persecution.

The IJ also found that Saban-Cach had not shown that the government would inflict, consent to, or acquiesce in, any future torture. The IJ reasoned that Saban-Cach never filed any official complaints with police, nor did he ever request any assistance from the government. Finally, the IJ also concluded that the evidence of generalized discrimination in Guatemala directed toward indigenous people failed to qualify as torture.

On appeal, the BIA affirmed the IJ's conclusions that Saban-Cach failed to establish past persecution, that he could reasonably internally relocate, and he had not satisfied his burden for establishing CAT protection.[20]

---

make findings on issues the decision of which is unnecessary to the result they reached)).

[17] AR 5.

[18] AR 106.

[19] AR 108.

[20] Because it affirmed the IJ's decision on dispositive issues, the BIA's decision does not address Saban-Cach's challenges to the IJ's findings that the Guatemalan government could not control the gang and that Saban-Cach was not persecuted on

The BIA affirmed the IJ's denial of withholding of removal and relief under the CAT. The BIA recognized that gang members had attacked Saban-Cach on multiple occasions and that the worst attack left him unconscious after he was stabbed with a broken glass bottle. However, the BIA agreed with the IJ that, in the aggregate, this abuse did not rise to the level of persecution. The BIA explained that, "because most of the incidents did not involve physical injuries, and because the worst attack did not require him to seek professional medical care for his physical injuries, the applicant did not establish harm rising to the level of past persecution."[21] The BIA further agreed with the IJ that, because there was no past persecution, there is no presumption of future persecution.

The BIA also concluded that, since the attacks all occurred in Montufar and Saban-Cach had been able to live safely in San Pedro for four years, he could reasonably internally relocate.

Finally, the BIA agreed with the IJ's conclusion that neither Saban-Cach's past harm nor the societal discrimination that indigenous people in Guatemala experience rises to the level of torture. This conclusion relied in part on the fact that Saban-Cach did not claim that the government ever personally harmed or threatened him and that neither Saban-Cach nor his father reported their attacks to the police.[22] Consequently, the BIA agreed with the IJ that Saban-Cach had not established governmental involvement or acquiescence in the attacks, and it affirmed the IJ's decision. This petition for review followed.

**II.**[23]

---

account of his race, particular social group, or political opinion.

[21] AR 4.

[22] The BIA also noted that there are discrepancies between the police report that Saban-Cach's father filed about his sister's assault and his father's assertions that a gang member kidnapped and raped her.

[23] Our jurisdiction is governed by 8 U.S.C. § 1252. Where the BIA "affirmed and partially reiterated" the IJ's decisions, we review both. *Blanco v. Att'y Gen.*, 967 F.3d 304, 310 (3d Cir. 2020) (quoting *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d

8

Although the BIA need not write an overly detailed explanation of its review of an IJ's decision, it must provide an adequate explanation of its ruling and afford us an opportunity to review it. Here, the BIA did neither. At times, the IJ's decision completely conflicts with the record. Yet, for reasons that are not at all apparent, the BIA affirmed the IJ's decision in its entirety.

A. Withholding of Removal

A noncitizen qualifies for withholding of removal if s/he establishes a "clear probability" of persecution upon removal.[24] In other words, the noncitizen must show that it is more likely than not that s/he would be persecuted if returned home.[25] This analysis starts with the question of whether the petitioner can establish past persecution. To make this showing, the petitioner must prove that the harm suffered in the past rises to the level of persecution based upon a protected status or trait.[26] These include "race, religion, nationality, membership in a particular social group, [or] political opinion."[27] The noncitizen must show that the protected ground "was or will be at least one central reason" for persecution.[28]

If a noncitizen establishes past persecution, a presumption arises that his/her life or freedom would be threatened in the future unless the government can show that internal relocation would be reasonable.[29] That burden is with

---

Cir. 2009)). We review only the grounds upon which the BIA denied relief. *Id.* We review legal determinations de novo and factual findings for substantial evidence. *Id.*

[24] *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011) (citing *INS v. Stevic*, 467 U.S. 407, 429–30 (1984)).

[25] *Id.*

[26] 8 U.S.C. § 1231(b)(3).

[27] *Id.*

[28] 8 C.F.R. § 1208.16(b)(1); *Matter of D-I-M-*, 24 I. & N. Dec. 448, 450 (BIA 2008).

[29] *Id.* § 1208.16(b)(1)(i), (b)(3)(ii). This burden-shifting regime was amended effective January 11, 2021. Under current law, the applicant bears the burden of establishing that internal relocation would be unreasonable. *See* Procedures for

the government, which must then show, by a preponderance of the evidence, that the noncitizen could reasonably and safely relocate to another part of the proposed country of removal or that there has been a fundamental change in circumstances.[30] If a petitioner cannot show past persecution, s/he can still prove future persecution by "establish[ing] that it is more likely than not that s/he would be persecuted on account of [a protected trait] upon removal."[31]

1. Past Persecution[32]

We first consider whether the BIA erred in finding that Saban-Cach did not experience past persecution. Saban-Cach argues the BIA: (1) committed legal error by conditioning a finding of past persecution on seeking—or sustaining injuries that require—professional medical care, and (2) that it failed to appropriately consider the cumulative effects of his mistreatment. We agree and address both arguments below. We also address the IJ's finding that Saban-Cach's persecution was not due to his status as a member of a protected group.

a. Legal Error

We turn first to Saban-Cach's argument that the BIA committed legal error in finding that the harm he suffered did not rise to the level of persecution. The BIA specifically held

Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Interview. 85 Fed. Reg. 80274, 80340 (placing the burden on an applicant to establish that it would be unreasonable to relocate, regardless of past persecution, when the persecutor is non-governmental). This amendment, however, only applies prospectively, *id*., and thus does not apply to Saban-Cach because he applied for withholding of removal in November 2020. *Id.*

[30] 8 C.F.R. § 1208.16(b)(3)(ii).

[31] 8 C.F.R. § 1208.16(b)(2).

[32] The government argues that we should apply the substantial-evidence standard to our past persecution analysis. It is true that, because "persecution" is a finding of fact, we generally review it under the deferential substantial evidence standard. *Doe v. Att'y Gen.*, 956 F.3d 135, 140 (3d Cir. 2020). But where factual findings "are based on a misunderstanding of the law, we will review the abstract legal determination *de novo*." *Id.* at 141.

that it did not rise to this level because "his worst attack did not require him to seek medical care for his physical injuries," and "most of the incidents did not involve physical injuries."[33] Both conclusions are based upon a misunderstanding of the law we recently clarified in *Doe v. Attorney General*.[34]

###### i. The Necessity of Professional Medical Care

In *Doe*, we held that a finding of past persecution cannot be conditioned "on whether the victim required medical attention . . . or even whether the victim was physically harmed at all."[35] Instead, there must be a case-by-case, fact-specific inquiry into "whether a petitioner's cumulative experience amounts to a severe affront[ ] to [that petitioner's] life or freedom."[36]

In response to Saban-Cach's claim that the BIA committed legal error, the government argues that the BIA did not condition a finding of past persecution on the absence of medical attention.[37] Instead, the government explains, Saban-Cach "not seek[ing] professional medical attention was just one of several factors supporting the [BIA]'s adverse finding on past persecution."[38]

This argument is disingenuous. The following sentence is the entirety of the BIA's explanation for rejecting Saban-Cach's claim that he demonstrated past persecution:

> We agree with the [IJ] that, because most of the incidents did not involve physical injuries, and because the worst attack did not require him to seek professional medical care for his physical injuries, the applicant did not establish harm rising to the level of past persecution.[39]

---

[33] AR 4.

[34] 956 F.3d 135 (3d Cir. 2020).

[35] *Id.* at 145.

[36] *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 110 (3d Cir. 2020) (quoting *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 341 (3d Cir. 2008)) (internal quotations omitted).

[37] Government Br. at 23.

[38] *Id.*

[39] AR 4; *cf.* AR 104–05 (The IJ's relevant analysis states, "While the respondent testified to having scars from the worst

The plain meaning of the BIA's analysis is that Saban-Cach did not establish past persecution *because* he did not suffer physical harm that required professional medical care. This reasoning directly contradicts *Doe*'s determination that a finding of past persecution does *not* rely on whether the victim sought medical attention.[40]

Furthermore, neither the IJ nor the BIA bothered to inquire what, if any, professional medical care was available.[41] Instead, the BIA assumed that, after being stabbed with a broken bottle, Saban-Cach "did not need sutures or surgeries or any further medical treatment."[42] Yet nothing on this record establishes that "sutures or surgeries" were available to him. The record does not establish that Saban-Cach would have been able to see a medical professional of any kind. Rather, the evidence in the record only indicates one option for professional medical treatment—a hospital that was far away. And it seems unlikely that Saban-Cach could have called an Uber (or similar ride-sharing service) to take him there.

Moreover, even if the legal standard required the petitioner to have injuries warranting such care, the record does not support the BIA's factual conclusion that Saban-Cach's injuries "did not require him to seek professional medical

---

attack that occurred, there is insufficient evidence to show that there was any lasting injury that rises to the level of persecution. The respondent did not seek any professional medal[sic] attention, nor did he require any professional medical care.").

[40] *Doe v. Attorney General*, 956 F.3d 135, 145 (3d Cir. 2020).

[41] Matthias S. Geck et al., *Traditional Herbal Medicine in Mesoamerica: Toward Its Evidence Base for Improving Universal Health Coverage*, Frontiers in Pharmacology, July 31, 2020, https://www.frontiersin.org/articles/10.3389/fphar.2020.01160/full ("[A] considerable proportion of the population of each country [in Mesoamerica] has no de facto access to healthcare provision from the public sector; a deficit partially compensated for…by traditional healers embedded in long-standing ethnomedical systems.").

[42] AR 104.

care."[43] His testimony was that he did not go to the hospital because it was far away and that his grandmother instead treated him with natural medicines. Regrettably, the government's response brief doubles down on this inaccuracy, stating that "the [BIA]'s statement that [Saban-Cach] did not seek 'professional medical attention' is accurate and supported by the record."[44] But this truncated quote misrepresents the BIA's own explanation, which was that, "the worst attack *did not require* him to seek professional medical care."[45] Thus, the government seeks to equate the decision to not seek professional medical care with the conclusion that medical care was not required. This is the kind of imprecise analysis that we rejected in *Doe*.[46]

Finally, the IJ and the BIA ignored the realities of the Guatemalan healthcare system, and the role traditional medicine plays in it. Both decisions placed substantial weight on the fact that Saban-Cach "did not seek any professional medical attention after [the most serious] attack."[47] Both noted that he "was simply treated with some herbal medicine by his grandmother."[48] However, neither the IJ nor the BIA bothered to consider that, in Saban-Cach's community, the herbal medicine that his grandmother administered may well have been accepted as the only treatment realistically available even for very serious injuries.

We have previously cautioned IJs and the BIA against ethnocentric evaluations of petitioners' resources. Petitioners primarily come from countries in the poorest and most dangerous regions of the world. Any presumption that they enjoy the same kinds of resources as their adjudicators is shortsighted and unfair. Unless the record supports it, IJs and

---

[43] AR 4.

[44] Government Br. at 23.

[45] AR 4 (emphasis added).

[46] *Doe*, 956 F.3d at 146 (pointing out the BIA's error in equating petitioner not seeking medical treatment with not requiring medical treatment as "[a]ll we know from his testimony is that he did not *seek* medical care because he feared for his well-being") (emphasis in original).

[47] AR 104.

[48] AR 3–4, 104.

the BIA should not assume that their own views of appropriate medical care and its ready accessibility make up a universal reality.

Petitioners for relief under the asylum system must be afforded the just hearing that due process and basic fairness demands. The immigration system can only provide a fair and neutral determination of the claims of people from different cultural and economic circumstances if adjudicators diligently avoid unrealistic assumptions about petitioners' circumstances.

> ii.    Multiple Attacks Involving Physical Injuries

We next address the BIA's finding that "most of the incidents did not involve physical injuries"[49] and the government's related argument that, without evidence of multiple physical attacks, Saban-Cach cannot establish past persecution. The government attempts to distinguish Saban-Cach's case from *Doe v. Attorney General*,[50] suggesting it is more analogous to *Thayalan v. Attorney General*.[51] A comparison of the facts of *Doe* and *Thayalan*, however, reveals that Saban-Cach's experience is more like the former than the latter.

In *Doe*, the petitioner, a Ghanaian citizen, hid his homosexuality for twelve years until his father discovered the petitioner in an intimate encounter with another man.[52] This discovery led to a violent mob dragging the couple into the courtyard, beating them, and discussing whether to kill them by burning or beheading.[53] Fearing for his life, the petitioner fled the country. Soon after arriving here, the Department of Homeland Security began removal proceedings.[54] We concluded that this harm met the requisite level of persecution because, "[i]n combination with these violent acts of intimidation and his injuries, the death threats were sufficiently

---

[49] AR 4.

[50] 956 F.3d 135 (3d Cir. 2020).

[51] 997 F.3d 132 (3d Cir. 2021).

[52] 956 F.3d at 139.

[53] *Id*.

[54] *Id*.

14

'concrete and menacing,' to transform this incident from a 'simple beating,' into outright persecution."[55]

In *Thayalan*, we examined whether a single incident wherein the petitioner was forcibly taken to an army camp where he was held for two hours, had his head hit against a wall, and was punched in the stomach established past persecution.[56] In affirming the BIA's finding that Thayalan's abuse did not rise to the level of past persecution, we distinguished *Doe*.[57] We reasoned that Thayalan's argument for past persecution was undermined because his abuse was a true "one-off," not coupled with concrete or menacing threats. He decided that he did not need any kind of medical attention, and he remained in the country for more than a decade after his detention. These factors combined to undermine his claim of past persecution.[58]

Saban-Cach's experiences are significantly more analogous to the facts of *Doe*. Indeed, the physical harm he suffered was arguably more severe than in *Doe*. Doe was severely beaten but was ultimately able to run away. In contrast, Saban-Cach was left unconscious after his attack—he was struck in the face with a glass bottle so hard that it broke, stabbed in the back with a shard of broken bottle, and was kicked repeatedly until "pieces of flesh [] came out."[59] His attackers only stopped after neighbors intervened. Saban-Cach "woke up in [his] house . . . blood everywhere."[60] His grandmother treated him with natural medicine. He still has visible scars on his forehead, back, and arms from this attack. He quite reasonably argues that if onlookers had not intervened, he "might very well be dead;"[61] the record is not to the contrary. Thayalan's injuries were, in contrast, much less severe. Thayalan did not seek medical care because he did not think he needed it. Saban-Cach, in contrast—unconscious and

---

[55] *Id.* at 144 (citations omitted).
[56] 997 F.3d 132 at 136.
[57] *Id.* at 141–42.
[58] *Id.*
[59] AR 140, 143.
[60] AR 141.
[61] Reply Br. at 11 (quoting *Doe*, 956 F.3d at 144).

15

bleeding—needed medical care and received it from his grandmother.

Moreover, Thayalan's physical attack was a true "one-off." Saban-Cach was physically attacked on at least four occasions, and he was threatened numerous other times.[62] And whereas Thayalan remained in his country for more than a decade following his attack, Saban-Cach fled the country a few years later, after first trying to relocate internally.

This is not to say that one incident cannot establish past persecution. "[T]he existence of multiple incidents is not a requirement" when determining whether the requisite level of harm has been met.[63] Indeed "a single incident, if sufficiently egregious, may constitute persecution."[64] Accordingly, although Saban-Cach was targeted on multiple occasions, the attack in which he was brutally beaten and stabbed with a broken bottle may, by itself, reach the required standard of harm for establishing past persecution. To find this incident insufficient to rise to the level of persecution suggests that egregiousness must go beyond being stabbed, kicked into unconsciousness, and left bleeding with pieces of flesh hanging out. Merely stating such a proposition is sufficient to refute it.

b. Failure to Consider Cumulative Effects

The BIA must also consider "the cumulative effect of the applicant's experience" when determining "whether a set of experiences rises to the level of a 'severe affront[] to the life or freedom of the applicant.'"[65] Saban-Cach claims that, by focusing on only a single instance of abuse, the BIA did not consider the psychological harm he suffered, his experiences in light of his young age, and the threats he received.

---

[62] AR 3.

[63] *Voci v. Gonzales*, 409 F.3d 607, 615 (3d Cir. 2005).

[64] *Doe*, 956 F.3d at 145.

[65] *Herrera-Reyes*, 952 F.3d at 106; s*ee also Cheng v. Att'y Gen.*, 623 F.3d 175, 192 (3d Cir. 2010) ("[T]he Board may not, in determining whether an asylum applicant suffered past persecution, take a single instance of mistreatment . . . from a larger pattern of abuse and confine its persecution analysis to the question of whether that single instance was, in and of itself, persecutory.").

16

Saban-Cach asserts that he suffered psychological harm as a consequence of the gang's abuse of his family and that such harm should have been considered in the BIA's cumulative analysis of his claim for relief. We have previously explained the significance of a petitioner's psychological harm resulting from harm to a family member when the petitioner was present during the infliction of harm.[66] Although, here, the record does not support a finding that Saban-Cach was present when the gang inflicted harm on members of his family, the psychological trauma of knowing what happened to them, especially his sister, could nevertheless be substantial. Accordingly, the BIA should have considered what, if any, emotional or psychological harm Saban-Cach suffered as a result of his family's mistreatment. The harm Saban-Cach endured from learning of the violence inflicted upon a family member was certainly relevant to an inquiry into the reasonableness of any fear of future persecution if he were returned to Guatemala.

Saban-Cach also claims that the BIA erred in failing to consider his experiences in the context of his youthful age. He argues that, "[a]lthough the initial attacks were not as violent as those he experienced later, they were still frightening enough to cause [him] to quit school before graduating for fear of his safety."[67]

Several courts of appeals have concluded that age can be a critical factor in determining whether a petitioner's experiences meet the threshold of past persecution.[68] These

---

[66] *See, e.g.*, *Camara v. Att'y Gen. of U.S.*, 580 F.3d 196, 204 (3d Cir. 2009), as amended (Nov. 4, 2009).

[67] Petitioner Br. at 22.

[68] *See Liu v. Ashcroft*, 380 F.3d 307, 314 (7th Cir. 2004) ("[A]ge can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of future persecution."); *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1046 (9th Cir. 2007) (holding the IJ should look at the events from the applicants' perspective and measure the degree of their injuries by their impact on children of their ages); *Ordonez-Quino v. Holder*, 760 F.3d 80, 92 (1st Cir. 2014) (noting "the BIA failed to address the harms Ordonez-Quino and his family experienced

courts differ in discerning the extent to which the BIA must consider a young petitioner's age. For example, in *Ordonez-Quino v. Holder*, the Court of Appeals for the First Circuit found the BIA committed legal error by failing to show that it "considered the harms [the petitioner] suffered . . . from his perspective as a child."[69] In contrast, the Court of Appeals for the Seventh Circuit in *Liu v. Ashcroft* held that the BIA's discussion of the petitioner's expulsion from school was sufficient to infer that the BIA was aware of the petitioner's age; thus a more comprehensive treatment was not required.[70]

We have never addressed the degree to which the BIA and IJ are required to consider incidents of claimed past persecution in light of the petitioner's age,[71] and we need not provide a definitive answer here. However, by way of guidance, we note that the higher threshold adopted by the Court of Appeals for the First Circuit requiring an explicit evaluation of a petitioner's claims in light of age would help ensure the BIA considered all relevant circumstances and the context of a petitioner's experience. Here, we need only note that the BIA should have explicitly considered what effect, if any, these experiences had on Saban-Cach given his youth.

Finally, Saban-Cach argues that neither the BIA nor the IJ mention nor discuss that gang members threatened him numerous times. Threats that are concrete and menacing may be sufficient to establish past persecution, particularly when coupled with incidents of physical harm.[72] A threat is concrete

---

cumulatively and from the perspective of a child); *Jorge-Tzoc v. Gonzales*, 435 F.3d 146, 150 (2d Cir. 2006) (same).

[69] 760 F.3d at 92–93.

[70] 380 F.3d at 314.

[71] *But see Perez Muniz v. Att'y Gen.*, 363 F. App'x 973, 980 n.4 (3d Cir. 2010) (declining to consider whether the BIA erred in failing to consider incident in light of petitioner's age because he was unable to establish motive); *Razzak v. Att'y Gen.*, 287 F. App'x 208, 213 (3d Cir. 2008) (per curiam) (concluding the IJ acknowledged the minor petitioners' status as children).

[72] *See Blanco*, 967 F.3d at 311–12 (holding threats that are concrete and menacing are sufficiently serious to constitute persecution).

and menacing "where the aggregate effect of a petitioner's experiences, including or culminating in the threat in question, placed a petitioner's life in peril or created an atmosphere of fear so oppressive that it severely curtailed the petitioner's liberty."[73] To meet this test, the threat must reflect an intent to inflict harm, but temporal proximity to other acts is not required.[74]

Saban-Cach asserts that gang members made several threats that should be considered concrete and menacing when considered cumulatively and in context with the totality of the evidence. As noted earlier, he testified that, while he was in school, gang members told him: "[W]e're not going to stop attacking you until you're part of us and, if not, until we take your life away. We're going to take your life away if you don't belong to us."[75] He further testified that immediately before the worst attack, a gang member told him, "[W]e told you until you don't [sic] belong to us we're not going to leave you in peace."[76] In his declaration, Saban-Cach also stated the gang members told him, "You know that if you don't join us we're not going to leave you alone. We're going to get you the same way we got your dad."[77] Following this threat, he was beaten with a bottle, stabbed and left unconscious and bleeding. Finally, while boarding a bus from Montufar to San Pedro, after being returned to Guatemala following his second failed attempt to enter the United States, gang members told him that "they were going to find . . . and kill [him]."[78]

The government's justification of the BIA's failure to consider these threats is unpersuasive. It characterizes the threats as "vague and unspecific."[79] That characterization can only be described as excessive adversarial zeal rather than an honest description of the record. When a pattern of actual violence substantiates threats of violence, the threats are

---

[73] *Herrera-Reyes*, 952 F.3d at 108.
[74] *Id.*
[75] AR 137.
[76] AR 140.
[77] AR 265.
[78] AR 266.
[79] Government Br. at 25.

concrete.[80] Moreover, the government's characterization of the threats as "vague" is both puzzling and disappointing given the beating and stabbing that left Saban-Cach unconscious and could have partially blinded him.

The government also argues that "Saban did not argue that the threats he received were 'concrete and menacing,' so the [BIA] was not prompted with a need to address the issue in any detail."[81] This argument is as disappointing as it is unconvincing. Saban-Cach did not use the words "concrete and menacing," but the brief filed with the BIA clearly states that "[t]he IJ . . . failed to consider the cumulative effect of the many threats and attacks against Respondent."[82] This assertion is certainly enough to prompt the BIA to focus on this issue. Moreover, the government does not address the IJ's failure to discuss threats, and we can think of no persuasive reason for such an omission. Accordingly, we can only conclude that the BIA, by ignoring these threats, failed to conduct a proper cumulative review of Saban-Cach's experiences.

c. Saban-Cach's Persecution as a Member of a Protected Group

Because the BIA found that Saban-Cach failed to establish a likelihood of persecution, it thought it was "unnecessary to address any of the remaining issues raised by [Saban-Cach] on appeal, including whether [his] proposed particular social group was cognizable and whether he demonstrated the requisite nexus between past harm and future fear and a protected ground under the Act."[83] Saban-Cach had challenged the IJ's conclusion—that the harm he suffered was not on account of any protected status—in his appeal to the BIA.

The IJ determined that "[e]ven if the harm that [Saban-Cach] suffered rose to the level of persecution, [he] has not established that any such persecution was or would be on account of a protected ground."[84] First, the IJ concluded that "young Guatemalan men who are recruited by a gang and

---

[80] *See Herrera-Reyes*, 952 F.3d at 112.

[81] Government Br. at 28.

[82] AR 17.

[83] AR 5.

[84] AR 105.

publicly refuse to join[,]" is not a cognizable social group because it is neither particular nor socially distinct.[85] And, even if it were, the IJ reasoned, Saban-Cach has not shown that he publicly renounced gangs or in a public manner refused to join a gang. Second, the IJ concluded that there is insufficient evidence to show that Saban-Cach held a specific political opinion or that he was persecuted on account of that political opinion. Finally, although the IJ recognized that the gang may have sought Saban-Cach's indigenous ethnicity as being useful to their agenda, "the gang only harmed the respondent specifically when he refused to succumb to those recruitment efforts."[86] The IJ thus concluded that Saban-Cach was not harmed on account of his being an indigenous person, but rather because of his refusal to join the gang.

That analysis misses the point. Saban-Cach has clearly established membership in a particular social group as an indigenous person in Guatemala. A particular social group is "(1) composed of members who share a common, immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[87] Saban-Cach's indigenous ethnicity—as indicated by his name, language, and appearance—is an immutable characteristic that made him socially distinct.[88] He established membership in a particularized group as evidenced from the gang's persecution of him for refusing recruitment that was attempted *because* he was of Kaqchikel Mayan indigenous ethnicity. This is reflected in the gang's threats, which included insults based on his indigenous identity (*e.g.*, "[I]ndigenous, Indian, terrible, terrible, ugly, terrible, silly, stupid Indian indigenous.").[89]

---

[85] AR 105.

[86] AR 106.

[87] *Radiowala v. Att'y Gen.*, 930 F.3d 577, 583 (3d Cir. 2019).

[88] *Komarovas v. Att'y Gen.*, 219 F. App'x 207, 210 n.4 (3d Cir. 2007) (noting that ethnicity is an immutable characteristic). *See also Negeya v. Gonzales,* 417 F.3d 78, 83 (1st Cir. 2005) ("A social group is composed of members who 'share a common, immutable characteristic.' Groups satisfying this criterion typically include racial and ethnic groups.") (internal citations omitted).

[89] AR 137.

21

The IJ simply overlooked this evidence that the harm Saban-Cach suffered was due to his being identified as an indigenous person. This focus ignored the testimony that the gang wanted to recruit him solely to use him as "bait" because he was an indigenous person.[90] Saban-Cach's credible testimony made clear that he was targeted because of his indigenous ethnicity.

2. Internal Relocation

The BIA determined that Saban-Cach failed to prove that he could not reasonably relocate. It relied on the fact that "those who attacked him were gang members not associated with the government, . . . the attacks were limited to one town, and . . . the applicant was able to live safely in another town for 4 years."[91]

Substantial evidence does not support the finding that he lived safely without problems in San Pedro. The BIA's rationale ignores that Saban-Cach credibly testified that the gang members recognized and threatened him after he left his hometown. He testified that he saw gang members in San Pedro on three occasions. They were following or looking for him, but he was able to run and hide from them. This was the case both before his first attempt to enter the United States as well as after he was removed from the United States to San Pedro. Saban-Cach explained:

> Although I returned to live with Evelyn's family in San Pedro Sacatepéquez, I did go to see my family in San Juan Sacatepéquez twice. The second time, when I was getting on the bus to go

[90] AR 12. The BIA put this burden on Saban-Cach because it and the IJ determined that he could not establish past persecution. If it had found that Saban-Cach had suffered past persecution, the burden would have shifted to the government to show, by a preponderance of the evidence, that he could reasonably and safely relocate to another part of the proposed country of removal or that there had been a fundamental change in circumstances. This burden-shifting regime was the mechanism in place when Saban-Cach applied for asylum. It has since been changed, but the changes were not retroactive. *See* footnote 80.

[91] AR 4.

back to San Pedro, people from the gang saw me and yelled that they were going to find me and kill me. They somehow managed to follow me back to San Pedro, because again I saw them on the street there. Fortunately, I was able to hide from them, waiting a long time to go back to Evelyn's house. After this I did not go back to San Juan Sacatepéquez again.[92]

Moreover, the BIA failed to acknowledge that Saban-Cach's younger brother—his only immediate family member still living in Guatemala—even refuses to tell Saban-Cach where he is living because, after a gang member attempted to run over him with a car, he fears further gang-related persecution. The BIA also ignored the expert's report that "it is exceedingly difficult for individuals—particularly indigenous individuals previously targeted by gangs—to move from the area in which they have grown up and find a safe, secure place to live."[93] As we recently made clear in *Nsimba v. Attorney General*, "[w]e know of no authority that interprets '*safely* relocate' as a synonym for 'relocate,' and we refuse the BIA's invitation to ignore that important condition."[94] In *Nsimba*, we joined several other circuit courts of appeals in concluding that the ability of a petitioner to relocate cannot require him or her to live in hiding to avoid persecution.[95] Although published subsequent to the BIA's decision here, *Nsimba* clearly highlights the BIA's error in concluding that Saban-Cach could reasonably relocate internally because he was able to run and hide from his persecutors while in San Pedro.

## B. Relief under the Convention Against Torture

The BIA also found no clear error in the IJ's determination that Saban-Cach failed to establish that the government of Guatemala would willfully acquiesce to his persecution. We held in *Myrie v. Attorney General* that the determination of whether an applicant has met the burden for relief under the CAT is subject to a two-pronged analysis.[96] In

---

[92] AR 266.

[93] AR 319.

[94] 21 F.4th 244, 255 (3d Cir. 2021) (emphasis in original).

[95] *Id*.

[96] *Myrie v. Att'y Gen*., 855 F.3d 509, 516 (3d Cir. 2017).

the first prong, the IJ must answer two questions: "(1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of torture?"[97] The second prong is "assessing whether an applicant has established that public officials will acquiesce to the feared tortu[r]ous acts of a non-state actor."[98] The IJ must again engage in a two-part inquiry. S/he must determine: (1) how public officials would likely react to the harms the petitioner fears; and (2) whether this response qualifies as acquiescence under the governing regulations.[99]

Saban-Cach argues that the BIA erred under both prongs of the *Myrie* inquiry. Under the first prong, he argues, the BIA failed to consider whether he faces future torture if removed. He also argues that the record contains ample evidence that he would be subject to torture if removed. Under the second prong he argues that the BIA erred in finding that he did not establish that public officials will acquiesce to the feared torturous acts of the gang.

1. *Myrie* Prong 1

Saban-Cach first argues that the BIA failed to consider either part of the first prong under *Myrie*. We agree. As noted above, the BIA had to answer the following questions under the first prong: (1) what is likely to happen to Saban-Cach if removed, and (2) does what is likely to happen amount to the legal definition of torture? The entirety of the BIA's relevant analysis consists of the following: "[W]e agree with the [IJ] that the harm that the applicant suffered in the past did not rise to the level of torture. We also agree that the societal discrimination against the Indigenous in Guatemala by itself does not rise to the level of torture."[100] As this shows, the BIA, and by extension the IJ, did not consider what is likely to happen if Saban-Cach is removed. It instead reviewed the harm that he already suffered and asked whether that harm alone constituted torture.[101] Whether a petitioner has been tortured

---

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] AR 6 (citations omitted).

[101] *Ghanem v. Att'y Gen.*, 14 F.4th 237, 248–49 (3d Cir. 2021) ("The agency took a much more circuitous route here . . .

before is a relevant consideration, but there are a number of other factors that the BIA should consider when determining the likelihood of future torture.[102] This alone warrants remand, but is not the end.

The BIA and IJ also failed to make clear that they "consider[ed] 'all evidence relevant to the possibility of future torture.'"[103] Of course, "the IJ and BIA need not discuss every piece of evidence mentioned," but neither can they "ignore evidence favorable to the [noncitizen]" without any explanation for the omission.[104] In adopting the IJ's analysis, the BIA overlooked significant evidence that Saban-Cach is likely to face torture if removed to Guatemala. At oral argument, the government acknowledged that the relevant objective evidence was more than a thousand pages. Yet, despite the voluminous evidence, the pertinent portion of the IJ's analysis consisted of only the following:

> The Court finds that the respondent has failed to establish that it is more likely than not that he would suffer tortured [sic] . . . . The respondent's objective evidence goes to generalized brutality in Guatemala rather than the respondent's personal risk of torture. The Court does not find that the respondent has been tortured in the past because the harm he has suffered does not rise to the level of severe physical or mental pain or suffering. While there is evidence to show that some general discrimination against the

---

rather than first analyzing 'what *is* likely to happen' under the initial *Myrie* inquiry.") (emphasis in original).

[102] 8 CFR § 1208.16(c)(3) ("[A]ll evidence relevant to the possibility of future torture shall be considered, including but not limited to: (i) evidence of past torture inflicted upon the applicant; (ii) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) evidence of gross, flagrant or mass violations of human rights within the country of removal; and (iv) other relevant information regarding conditions in the country of removal.").

[103] *Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019).

[104] *Id.*

25

indigenous people exists in Guatemala, there is insufficient evidence to show that this discrimination alone rises to the level of torture as described by the law.

. . . .

While the Court recognizes that country conditions in Guatemala show that gang violence exists, the Court does not find that the respondent has met the high burden to establish that he himself would be singled out for torture if returned to his home country.[105]

The government argues that the IJ's reference to Saban-Cach's objective evidence shows that she considered the expert report and evidence of country conditions. But merely using the words "objective evidence" does not establish that the IJ actually considered this evidence, given the flaws in the IJ's analysis here.

The IJ's conclusion that the "objective evidence goes to generalized brutality in Guatemala rather than the respondent's personal risk of torture" suggests she did not undertake a thorough analysis of the objective evidence, including the expert report. The report explains that "it is exceedingly difficult for individuals—particularly indigenous individuals previously targeted by gangs—to move from the area in which they have grown up and find a safe, secure place to live."[106] The country report concludes that "[b]ased on all the information available . . . , both from this particular case as well as the general conditions in Guatemala, . . . Selvin Gerardo Saban[-Cach] faces continued harassment, threats, and serious bodily harm should he be returned to Guatemala."[107] This objective evidence is relevant to Saban-Cach's specific risk of torture.

The evidence establishing that Guatemalan gang violence still runs rampant supports the idea that the gang-

---

[105] AR 69 (citation omitted).
[106] AR 319.
[107] AR 319.

related violence Saban-Cach suffered in the past is likely to continue if he returns. That is, he would be at risk of being beaten or killed because the gang that targeted him is still operating and has, in fact, grown in strength and numbers. We are thus convinced that there is substantial evidence that Saban-Cach is likely to face similar harm if returned.[108]

We also believe that this record supports a conclusion that the harm that probably awaits him constitutes torture. An act constitutes torture if "severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as" punishment, intimidation, coercion "or for any reason based on discrimination of any kind."[109] Given the gang's previous death threats and beatings, the harm that the gang would likely subject Saban-Cach to if he were returned to Guatemala could rise to the level of torture as it is intentionally inflicted for the purposes of intimidation as well as coercion and punishment for refusing to join the gang.

2. *Myrie* Prong 2

Saban-Cach also argues that the BIA erred in determining the second prong: assessing whether he established that public officials would acquiesce to the feared torturous acts of the gang. Again, the BIA had to engage in a two-part inquiry. It had to decide (1) how public officials would likely react to the harms Saban-Cach fears, and (2) whether this response would qualify as acquiescence under the governing regulations. Saban-Cach argues that the BIA's reliance on the fact that he did not report incidents of abuse to the police is insufficient to support a finding that he failed to establish the Guatemalan government would willfully acquiesce to his torture.

In assessing this prong, the BIA concluded, "[W]e agree with the [IJ] that there is insufficient evidence that the government would instigate, consent to, or acquiesce in (to include the concept of willful blindness), the applicant's torture

---

[108] *See Ghanem*, 14 F.4th at 249; *Quinteros*, 945 F.3d at 787; *Guzman*, 956 F.3d at 181–82.
[109] 8 C.F.R. § 1208.18(a)(1). *See Quinteros*, 945 F.3d at 787 n.72.

upon his return to Guatemala."[110] As support, the BIA pointed out that Saban-Cach has never "been personally harmed or threatened by a government official in Guatemala" and he "did not report his problems with the gang members to the police."[111] In making this determination, the BIA appeared to conflate both step two inquiries. Instead of first evaluating all of the evidence to determine the government officials' likely response, and *then* asking whether that response constitutes acquiescence, the BIA looked to some of the evidence to determine whether it suggests the officials would acquiesce.

We made clear in *Myrie*, however, that to assess whether a petitioner established that public officials would acquiesce to the feared torturous acts, a two-part analysis must be conducted.[112] Because this analysis includes first a question of fact—how public officials would likely react to the harms feared—and then a question of law—would this response qualify as acquiescence under the governing regulations—the BIA cannot consolidate these questions, as it must apply two different standards of review.[113]

This leads to another error related to the standard of review. The BIA must review the first, factual question for clear error and the second, legal question de novo.[114] In affirming the IJ's decision of the second question regarding acquiescence, the BIA concluded that it found "no clear error in the [IJ]'s predictive fact-finding."[115] Accordingly, in addition to not bifurcating the *Myrie* step-two inquiry, the BIA also erred by applying this heightened standard of review to a legal question. Because of these errors, "we have little insight into the basis for [the BIA's] determination that the IJ's opinion 'clearly reflects that [s]he used the proper "willful blindness" standard in relation to the issue of acquiescence.'"[116] Accordingly, on remand the BIA needs to reassess each question.

---

[110] AR 6.
[111] AR 6.
[112] 855 F.3d at 516–17.
[113] *Id.*
[114] *Id.*
[115] AR 6.
[116] *Myrie*, 855 F.3d at 517.

Moreover, the limited analysis the BIA supplied is completely inconsistent with this record. Saban-Cach concedes that he neither was harmed by a government official nor reported his problems to the police, and the IJ was not wrong in considering those facts when trying to determine how the government officials might act. However, these facts provide little insight into the potential actions (or inactions) of the police. Yet the BIA relied exclusively on them *and no other facts* in making its determination. Further review of the record establishes that the government's only response to Saban-Cach's wife's complaints about the gang's threatening behavior and specifically to his sister's abduction and rape was consistent with acquiescence.

Finally, there is considerable evidence that would support a finding that the government officials are willfully blind to the violence of gang members, especially against indigenous people. There is even evidence suggesting the police are, themselves, involved with the gangs. For example, the BIA should have considered the expert report that described how "there are serious questions about the extent to which Guatemalan officials are cooperating with the gangs."[117] This report explained that gang members "include former members of the Guatemalan . . . police forces."[118] Allegations of gang influence and corruption reach the highest levels of local government. In fact, the mayor of the town in which Saban-Cach lived was accused of being affiliated with the local gang. Saban-Cach himself testified: "[the police] were associated with [the gang]. . . . I felt that I was more at risk if I denounced them. I know that I was never going to get any, any protection from them."[119]

The expert report supported Saban-Cach's conclusion, noting, "[t]here is no indication that the quality of policing in . . . San Juan Sacatepéquez has improved in the last ten years; meanwhile there is clear evidence that the gangs have grown larger and stronger."[120] Finally, the report also described how "racism is present throughout the [police] and, unfortunately it

---

[117] AR 314–15.
[118] AR 308.
[119] AR 138.
[120] AR 318.

can and does play out with indigenous people being ignored, their complaints dismissed, or even assaulted for no other reason than their ethnicity."[121]

The BIA did, however, consider Saban-Cach's father's testimony that makes the same claim. In this testimony, his father described how he had filed a complaint with the police after a gang member kidnapped and raped Saban-Cach's sister, but the police did nothing. Yet the BIA explained that this testimony was inconsistent with the complaint, which makes no mention of a rape or a kidnapping and instead describes this as a domestic violence incident with the sister's boyfriend, a member of the gang. Without further explanation, this is not necessarily an inconsistency. Even in our country, there is a sad history of authorities ignoring claims of rape between close acquaintances and dismissing such incidents as merely "domestic violence." They thus ignore not only the seriousness of the assault, but the underlying criminality.[122] It is clear that the police failed to take any meaningful action to investigate the complaint. Taken together, the police's inaction with regard to the complaint, the expert's report, and the sworn testimony of Saban-Cach that the police would not protect him because he is indigenous, suggest that the police would likely not be responsive.[123]

### III.

For the foregoing reasons, we will grant Saban-Cach's petition, vacate the BIA's order, and remand to the BIA for further proceedings consistent with this opinion.

---

[121] AR 318.

[122] *See, e.g.*, *Thurman v. City of Torrington*, 595 F. Supp 1521 (Dist. Ct. Conn. 1984) (highlighting for the first time how police may be affording more protection to women who do not know their abusers than women who are the victims of domestic violence).

[123] If on remand the BIA determines that the police would be willfully blind to the gang's future torture of Saban-Cach, then that conclusion would be dispositive of the answer to the second question under this prong: whether that response would qualify as acquiescence. *See Roye v. Att'y Gen.*, 693 F.3d 333, 343 (3d Cir. 2012).